1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
VERISIGN, INC.,                :
            Plaintiff,         :
                               :
    vs.                        : Case No. 1:14-cv-1749
                               :
                               :
XYZ.COM, LLC, et al.,          :
            Defendants.        :
                               :
-------------------------------:
```


HEARING ON MOTIONS


June 12, 2015


Before:  Michael S. Nachmanoff, Mag. Judge


<u>APPEARANCES</u>:

Randall K. Miller and Nicholas M. DePalma,
Counsel for the Plaintiff

Derek A. Newman and Timothy J. Battle,
Counsel for the Defendants

2

1                NOTE:  The case is called to be heard at 10:08 a.m.

2     as follows:

3                THE CLERK:  VeriSign, Incorporated versus XYZ.com,

4     LLC, et al., case number 14-cv-1749.

5                MR. MILLER:  Good morning, Your Honor.  Andy Miller

6     and Nick DePalma for VeriSign.  We are here with our in-house

7     counsel, James Hubler.

8                THE COURT:  Good morning.

9                MR. DePALMA:  Good morning, Your Honor.

10               MR. HUBLER:  Good morning.

11               THE COURT:  Good morning.

12               MR. BATTLE:  Your Honor, Timothy Battle as local

13     counsel.  I am here with Derek Newman, who has been admitted

14     pro hac vice for the defendants XYZ.com and Daniel Negari.

15               THE COURT:  Good morning.  Good morning, Mr. Newman.

16               MR. NEWMAN:  Good morning.

17               MR. BATTLE:  Mr. Newman will handle the argument

18     today.

19               THE COURT:  Thank you.  So what I would like to do,

20     and I am happy to hear from you, Mr. Miller, we have two

21     motions still pending.  I was hopeful that perhaps the extra

22     time would allow the parties to talk a little bit further and

23     narrow the issues and also have time to produce further

24     documents because both parties indicated in the various

25     pleadings that with regard to a number of issues, it didn't

1    seem like there was a dispute as to whether documents should be

2    produced.  It was a matter of whether they had been produced

3    fully or the timing of when they would be produced.

4         And so, I was slightly optimistic that the passage of

5    time would at least narrow issues because it would give the

6    parties a little bit more time to work those things out and

7    turn them over.

8         I appreciate the reply brief that plaintiff provided,

9    which did I think substantially narrow the outstanding issues,

10   and we can go over those.  I think with regard to the

11   defendants' motion, at least as I read the reply brief, there

12   was less that had been narrowed by the parties.

13        And so, although I'm not eager to do it, if we need

14   to go through it extensively, we can do that because we need to

15   get resolution for both sides here so that you can get on to

16   the more substantive issues in the case.

17        MR. MILLER:  Yes, Your Honor.  We have worked hard to

18   narrow the issues.  What I would propose to do, I just have

19   three points to make about our motion that might be a way of

20   further narrowing, just to tee up like three discrete issues

21   for the Court to consider and then maybe go from there.

22        THE COURT:  That would be fine.

23        MR. MILLER:  Okay.  So with respect to our motion, I

24   have three points.  The topics are the bulking strategy that

25   we've been unraveling.  There is this Net Saw agreement.  And

1   then there are e-mails.  And let me just take those in turn.

2            One of the difficulties, and it has to do -- there is

3   an element of like what format the documents are being produced

4   in.  There is also sort of what is being produced.

5            Now, I think Mr. Newman has said in his papers, I'm

6   sure he'll say today, that there has been 73,000 pages produced

7   to us, which --

8            MR. NEWMAN:  134,000.

9            MR. MILLER:  It's now 100 -- well, there was a

10  2:44 a.m. e-mail, is that -- okay.  So there was an e-mail that

11  came in this morning.  So is that the delta between 73 and --

12  there was an e-mail that came in at 2:44 this morning that we

13  haven't had a chance to review.  The last number that I am

14  aware of is the 70 -- something like 74,000.

15           The problem -- that sounds like an enormous

16  production, so it sounds like they're doing a lot.  The problem

17  is, we're getting stuff -- and I have brought examples to show

18  you because I think unless you see it, it's difficult to

19  describe --

20           THE COURT:  Well, I don't want to cut you short, but

21  with regard -- you set out very well the Excel spreadsheets

22  that were divided into 40,000 PDFs.  And that if the issue of

23  providing it in native format, or in an OCR format --

24           MR. MILLER:  Yes.

25           THE COURT:  -- or in a way that could be looked at,

1    would be far more valuable.  And so, I'm not so concerned with

2    the total number of pages.

3            MR. MILLER:  Okay.  Okay.

4            THE COURT:  I get the argument --

5            MR. MILLER:  Okay.

6            THE COURT:  -- that there can be a very large number.

7    But in fact, if an Excel spreadsheet is divided up into PDFs,

8    it can seem like a tremendous amount of information and it's

9    really useless.

10           MR. MILLER:  And just to complete this bulking point,

11   in addition to the printout of the Excel spreadsheet at 40,000

12   pages, there is also extensive materials produced that are in

13   Chinese, and I'm not sure what that is.  There is extensive

14   material that is produced that appears to literally be

15   gibberish in the sense that it's just characters and numbers on

16   a piece of paper and a lot of blank pages.

17           There is also extensive production of other parties'

18   Web sites, including hardcore pornography Web sites.  I believe

19   this is an attempt to show that there are people that are

20   actually using XYZ domains, and so they're producing their Web

21   site to show the actual use, but it's just -- we didn't ask for

22   that and it's extensive.

23           So that when you get past the categories of bulking

24   that I sort of at a high level described, what's then left, you

25   know, is sort of what might be hopefully responsive to our

1    document requests, and it's very little.

2          And so, let me just move on to the other two of the

3    three points I have to ask what we would be looking for today

4    and just trying to narrow it.  We've asked for e-mails -- what

5    we would expect to see in a case like this is that Daniel

6    Negari of XYZ and other personnel that have already been

7    identified as persons with knowledge would be e-mailing each

8    other, for example, about the advertising.  We've asked for

9    e-mails about VeriSign, that mentioned VeriSign, or that

10   mention the Network Solutions deal that's at the center of the

11   case.

12         And we've gotten -- I mean, there are maybe a couple

13   pieces of paper, but it's not produced in native format.  There

14   is no way to tell whether there is attachments or other e-mails

15   associated with it because of the absence of the native format.

16         And the volume, which is literally sort of a piece of

17   paper here and there, suggests to me that there is a

18   significant production that is still to be done.

19         Now, you know, in our discussions there have been --

20   and maybe this 2:44 a.m. e-mail this morning represents sort of

21   a narrowing of what I just described, but that's -- we have to

22   start taking depositions.  We had a deposition of Mr. Negari

23   scheduled that we pushed off so that we could try to narrow

24   these issues.  That deposition now is going forward on Monday.

25         But I just believe that the e-mails that we would

1    expect to see, especially among the people who are identified

2    as persons with knowledge in the initial disclosures, that

3    there would be some discussion about -- you know, Mr. Negari,

4    for example, says that he has a multimillion dollar advertising

5    budget annually in his interviews publicly, but we haven't seen

6    any -- there is no work-up, there is mock-up of the

7    advertising, there no conceptualization, there is no e-mails

8    back and forth.

9            One other aspect of this is we asked for e-mails with

10   certain third parties.  For example, this company Donuts.

11   There is a motion to quash a subpoena in Seattle in which there

12   was a representation, oh, we're all -- we don't have to produce

13   documents in Seattle because we're producing them here in

14   Virginia.  But there was nothing produced initially.  And then

15   after we asked about that, after that declaration was filed, we

16   got like six pieces of paper.

17           And again, it's not in a native format.  There looks

18   like there is these big gaps on those six pages that look like

19   material might be redacted.  We just have no idea, no way of

20   knowing.

21           And so, the concern is that we want to be able to do,

22   as best we can, complete depositions.  We have to start

23   immediately as of Monday.  I'm flying out to Los Angeles to

24   take Mr. Negari's deposition, and I don't want to have to come

25   back here and ask you to reopen that if we get, you know, all

1    the stuff later.  I mean, we'll try to review the material that

2    came in at 2:44 a.m.

3          But this concept of e-mails, internal e-mails and

4    e-mails with certain third parties, is probably the number one

5    issue.  The bulky material, the pornographic sites, the long

6    lists and everything else, are not responsive and they are not

7    helpful, they don't advance the ball.  And it is sort of

8    misleading to put out the 124,000, whatever it is, aggregate

9    number, when it's probably more like a much smaller set.

10         The final thing I would say is we told you that

11   certain issues were moot in our filing, I think it was

12   yesterday or the day before.  But we're just not sure because

13   we -- for example, one of those issues was the Network

14   Solutions contract between XYZ and Network Solutions.  We asked

15   them -- we said, would you please produce that, that's a key

16   document.

17         So they said, okay, here it is, and they identified

18   it by Bates number.  And we said, okay, good, we got it, that

19   issue is now moot.  Last night Network Solutions produced

20   documents in response to a subpoena and they gave us this other

21   document that is a contract between Mr. Negari, signed by Mr.

22   Negari with Network Solutions that we didn't get from the

23   defendants.

24         So again, I think it might just be a matter of like

25   we're finally now focussed on the task and working hard, but

1    it's difficult for us to prepare for depositions when we've got

2    boxes and boxes of, you know, lists and pornography and

3    everything else, but we don't have any of the Network

4    Solutions.  For example, no e-mails about Network Solutions,

5    this deal.

6         And just so the Court understands the relevance,

7    we've alleged in the complaint, and we've talked about this

8    extensively in the motion for judgment on the pleadings, that

9    the number one advertising message that we're worried about is

10   they went out to the market and said, we have 447,000

11   registrations in the first six months.  And this is in August.

12        And we said, those are phantom, those are not actual

13   purchasers.  Those are just made-up people, that you just gave

14   them away, people didn't even know that they had them.  We want

15   to know about -- and they said, well, we had Network Solutions

16   do that.  We don't really know exactly how they did it, we had

17   Network Solutions do that.  But they paid us for it -- Mr.

18   Negari went out and gave interviews and said, well, I got $8 a

19   domain name for that, so I got paid.

20        But then it comes -- then we see other interviews

21   that he is giving where it's clear that he didn't get paid.

22   That there is actually -- those are free give-aways.

23        So that's kind of like the number one transaction at

24   issue in this case.  We don't have any e-mails.  We don't know

25   exactly how the deal was negotiated.  We don't know what the

1   e-mails between Network Solutions and Mr. Negari could be.  I'm

2   going to ask him on Monday about this, and, you know,

3   presumably he's going to say that there are other

4   correspondence and e-mails.

5         The final thing I would say and I will sit down is

6   that this is a Lanham Act false advertising case.  We have one

7   count, false advertising.  We would expect to see e-mails and

8   communication about these advertising statements.  The two at

9   the center of the case are what I just described, the 447,000

10  registrations when in fact they are fake, they are not real

11  people, they are not real testimonial lists, not real users of

12  XYZ, they are just made up numbers.

13        The second is this gross exaggeration of the

14  availability of .com domain names.  Mr. Negari says there is

15  nothing but a dash and a couple of numbers left.  But millions

16  of people register .com every quarter.

17        There has been in the papers, including the briefs

18  submitted to you, this mischaracterization of our -- what

19  advertising statements we're challenging.  They say in their

20  most recent paper like we're -- you know, that we complain

21  about this dusty car that is compared to .com.  That is

22  described in the complaint for sure, but the advertising

23  statements are the two that I just gave you:  447,000

24  registrations when in fact that's fake, no one exists and he

25  never got paid; and there is nothing available on .com except

1   some dashes and numbers and gibberish.  That's not true,

2   millions of people register every quarter.  That's the

3   advertising claim.

4          So there has been in the papers, you know, attempts

5   to say, oh, they complain because we compared .com to a dusty

6   car.  That's not the advertising statement.

7          So those are the two advertising statements.  And

8   we're simply looking for documents and e-mails about those two

9   statements, about the Network Solutions deal so that we can

10  test it and be prepared for trial.

11         THE COURT:  Thank you.  Mr. Newman, let me start by

12  asking and you a couple of questions to try and focus this

13  discussion.

14         With regard to the issue of the ESI, is there a

15  reason or an impediment to providing the information, for

16  example, the Excel spreadsheets in Excel, or in the native

17  format, or in an OCR way, obviously going beyond Excel, so that

18  whatever is produced can be easily looked at and reviewed in a

19  meaningful way?

20         MR. NEWMAN:  No, Your Honor.  Which is why as soon as

21  they raised the issue, we produced it.

22         The Court should deny the motion to compel for two

23  reasons.  The first is, everything that VeriSign seeks in its

24  reply brief, it didn't ask for in its opening motion.  These

25  are new issues.  They didn't meet and confer about those

1    issues.  But as soon as we received the reply brief, we

2    communicated with them and produced everything they asked for.

3           So, for example, yesterday my colleague spoke with

4    Mr. DePalma, my friend here to your left, and specifically

5    provided to him every Excel document he wanted.

6           And what I have here is the e-mail that Mr. Miller

7    refers to.  The e-mail has by Bates numbers the replacements.

8           So Mr. DePalma said, here is the Bates range of Excel

9    documents we can't read.  We replaced them and then we gave

10   them in this e-mail right here Bates numbers that say where the

11   native files are.

12          And there is a huge irony to this argument.  Namely,

13   VeriSign's production to XYZ was all gibberish without load

14   files that couldn't be used in Relativity.  They only have

15   2,000 pages, so it's easier to go through than ours, but it's

16   ironic that they're making the complaint.  We replaced it as

17   soon as they raised it, but yet they have not replaced their

18   production which we can't read and is totally deficient.

19          THE COURT:  Well, I want to be sure that we go

20   through all of the issues here, but I think just for the sake

21   of clarity for my sake, let's talk about the plaintiff's motion

22   first and then we'll talk about the defendants' motion.  And

23   certainly it's helpful to know to the extent that they're

24   providing things in one format or another, but let me just make

25   sure that I'm clear.

1        What you're saying to me is that they have in their

2   possession now in electronic format the ability to look at

3   those Excel spreadsheets and other things that were provided

4   solely as single page PDFs in native format or in a standard

5   loadable format, is that correct?

6            MR. NEWMAN:  Yes, Your Honor.

7            THE COURT:  Okay.  Let me just very quickly make sure

8   that there isn't a difference of opinion there.

9            Mr. Miller, is there any confusion about that at this

10  point?

11           MR. MILLER:  Your Honor, so I've -- what I've been

12  handed is an e-mail, I think it's dated -- is it dated

13  yesterday?  Is it yesterday that this --

14           MR. NEWMAN:  Yes.

15           MR. MILLER:  So there is a 2:44 a.m. this morning

16  e-mail with additional production, and apparently yesterday

17  there is an e-mail to Mr. DePalma with attachments.

18           And so, part of it is that I thought we had to keep

19  this motion on file so that maybe we could have a surge of

20  activity at the last moment, and that appears to have been what

21  has happened.  But we haven't had a chance to review the

22  2:44 a.m. this morning production and this e-mail that came in

23  yesterday, we haven't been able to evaluate how it lines up

24  with the 40,000 pages of lists and columns.  But maybe it

25  narrows the issue.

1          MR. NEWMAN:  This issue wasn't raised until recently,

2     and we addressed it as soon as it was raised.

3          As to the --

4          THE COURT:  Well, my inclination is to recess court

5     and have the lawyers talk to each other.  It is the least

6     efficient way to resolve this by having me ask questions and

7     then confirm with each set of lawyers what's going on.  And I

8     certainly appreciate that an e-mail received at 2:40 in the

9     morning is difficult to have reviewed and compared to documents

10    by 10 o'clock this morning, but it is somewhat frustrating for

11    me to be in the position of hearing this played out now,

12    especially after the parties had an extra week when we

13    continued this matter.

14          And so -- and to the extent we get to the defendants'

15    motion, and there are issues with regard to the manner in which

16    documents were provided by VeriSign to XYZ that are difficult

17    look at in their format, obviously that's something that will

18    need to be addressed.

19          You know, both of you submitted a joint discovery

20    plan that addresses ESI and makes clear, as you would expect in

21    any litigation, that the parties will work together to provide

22    information in the most cost effective and reasonable manner so

23    that they can be looked at, whether that's PDFs or OCR readable

24    or in the native format.  And sophisticated lawyers and

25    sophisticated clients like this should be on top of that issue

1     right from the start, it shouldn't require sending documents

2     and then having the other set of lawyers ask to get it in a

3     different format.

4              So I'm, you know --

5              MR. NEWMAN:  Your Honor --

6              THE COURT:  And so, that is simply consistent with

7     the joint discovery plan, and we can address that after we

8     recess and you talk about it.  But before we do that, let me go

9     through these other issues.

10             One of the issues that they've raised were specific

11    requests for production of documents related directly to

12    e-mails that are specifically relevant to the deposition that

13    is set on Monday.

14             So my first question is, are there any e-mails that

15    you are aware of that are responsive to the discovery requests

16    that have been propounded, especially of Mr. Negari, whether

17    they are about contracts with Network Solutions, or they are

18    about the advertising campaign, or the multimillion dollar

19    budget, or contacts with the commentators who are listed,

20    including NPR and the others who had articles about XYZ, the

21    things that are specified there?  My understanding is that

22    there are either no e-mails or a very small number.  I think

23    the number of e-mails referred to with regard to Donuts was

24    six.

25             If that's all there is, that's all there is.  And if

1   you want to put it on the record and tell the Court that that's

2   all that exists, then so be it.  You can't produce things that

3   don't exist.

4        But if there is a trove of e-mails that are

5   responsive to requests that have been made, then they need to

6   be produced.  And frankly, they need to be produced before the

7   deposition or Mr. Negari is going to have to be subject to

8   sitting down a second time after those documents are produced.

9   That is inefficient, I am sure it's not convenient for Mr.

10  Negari.  Frankly, it's not convenient for the lawyers.  Even

11  though everyone prefers to have two shots than one, I'm sure

12  they would prefer to do a single deposition in which they get

13  it all done at one time.

14        So I'm asking you, are there any documents that are

15  responsive to the requests for production, including 16 and 19

16  and the other ones that have been specified in the papers, that

17  have not been turned over?

18        MR. NEWMAN:  Your Honor, there are no documents

19  responsive to any of VeriSign's requests for production of

20  documents that XYZ hasn't already produced.

21        The 134,000 pages of documents is not bulking.  They

22  are documents that are responsive to requests.  I know they are

23  responsive to requests because we had nine lawyers sitting in a

24  room for weeks seven days a week reviewing them and preparing

25  logs.

1          The Donuts e-mails, for example.  As soon as VeriSign

2    said, we don't see Donuts' e-mails, we identified them by Bates

3    numbers.  We weren't required to do that, but we did that.

4          And I should also add that a lot of the e-mails that

5    VeriSign is requesting here today are not responsive.  There is

6    no requests for e-mails with Network Solutions.  There is

7    requests for agreements with Network Solutions, which have been

8    provided on multiple occasions.

9          And XYZ is not withholding any documents.  We have

10   fully completed the delivery of documents.  It was a huge

11   burden, it was a huge expense.  XYZ engaged an outside vendor

12   to do the search.  One of the requests was for every document

13   that mentions .com or VeriSign.  Almost impossible because

14   every e-mail address has .com.

15         So we contacted VeriSign and we said, this is almost

16   impossible.  VeriSign says, here are some search queries we

17   would like you to run.  We did that.  That turned up several

18   hundred thousand pages of documents.  We narrowed those, we

19   reviewed them, we produced them all.

20         When VeriSign complains about this bulking, it's

21   largely in response to that particular request for production

22   of documents.

23         When VeriSign talks about Chinese, that's because in

24   the complaint and in the requests for production of documents

25   VeriSign refers to this Xin Net, which is a Chinese registrar.

1    And VeriSign wants all the promotions in connection with that

2    registrar.  We produced them.  They are in Chinese.  We have no

3    obligation to translate them.  And we haven't translated them.

4    We're producing exactly what was made available on the Internet

5    because VeriSign asked for it.

6             THE COURT:  Okay.  Why don't you address the

7    outstanding issues with regard to your motion, and then I think

8    we'll recess so that the parties can talk further to see

9    whether or not after we have had this discussion there is

10   anything that's been resolved and doesn't require a ruling from

11   me.

12            MR. NEWMAN:  Your Honor, every issue in our motion

13   remains outstanding.  This is a case between two competitors in

14   the highly competitive field of domain names.  It hasn't always

15   been highly competitive.  Rather, VeriSign had a legal monopoly

16   for almost two decades, but recently the domain name business

17   has been opened up to competition.  There are now hundreds of

18   competitors.  And everyone seems to be surprised that one of

19   the least capitalized of those competitors, XYZ, has sold more

20   domain names than anybody else.

21            VeriSign has identified in its Security's filings and

22   publicly that there is huge risk to VeriSign investors because

23   of all the new domain name competitors, and VeriSign has every

24   interest in ensuring that the competition doesn't ruin what was

25   a monopoly.  XYZ being the largest, VeriSign files this

1    lawsuit.  The lawsuit lacks merit.  The claims that VeriSign

2    makes I think fail as a matter of law.

3            We've requested documents to prove the defense.  For

4    example, as VeriSign notes, one of the most intense issues in

5    this case is whether registering free domains and then

6    publicizing the number of domains constitutes false

7    advertising.  It doesn't.  It doesn't because VeriSign did it

8    for years, did it for years and then entered into a new

9    agreement with this company ICANN that prohibited it from

10   certain marketing practices.

11           Its risk profile in its Security's filings indicate

12   that it's at a competitive disadvantage because all the other

13   competitors are allowed to run certain promotions that it is

14   not.  We need that agreement with ICANN, we need to see that.

15           We also need to see the correspondence internally at

16   VeriSign.  For example, I would expect there would be e-mails

17   where one VeriSign person would say, what could we sue Negari

18   for?  And the other says, how about false advertising.  And

19   then a response that says, it's not false advertising, we've

20   been doing it for years.  That would support our defense.

21   We're confident those type of materials exist.  We are entitled

22   to them.

23           Our motion seeks everything that we requested in our

24   requests for production of documents.  VeriSign complains that

25   there is lots of requests.  But most of them are contention

1    interrogatories, produce all documents relating to your

2    contention that.  It's a single sentence, it's one line or two,

3    it's very limited, it's very narrow.  It goes directly to

4    what's in the complaint and we're entitled to it.

5           VeriSign wants to edit it to produce all documents

6    that support your contention that, because obviously VeriSign

7    doesn't want to disclose the e-mails that hurt its case, but

8    XYZ is entitled to that because we need to defend the case.

9           VeriSign has produced very little, 2,000 pages.  A

10   couple weeks ago I conferred with VeriSign's counsel and I

11   said, you've only produced a few hundred pages, 1,500 I think

12   it was at the time.  He said, we have 65,000 pages coming.

13          And we had set up our lawyers, our room of lawyers to

14   be prepared for this.  It never arrived.  I sent an e-mail

15   asking about it.  And he said, that was just an estimate.

16          And so, what my guess is is that VeriSign internally,

17   the lawyers, the good gentlemen who are representing VeriSign,

18   found 65,000 responsive documents and then conferred with their

19   client and their client said, don't produce this.  And so, what

20   did they produce?  They produced copies of XYZ 's Web site, we

21   have that.  They produced Security's filings that we had before

22   they filed the lawsuit because it's all public.  And they

23   produced a single marketing report over and over and over

24   again, none of which was produced in the ESI format consistent

25   with the joint status report.  Which is why I said earlier that

1  their argument on that point is ironic.  As soon as they raised

2  it with us, we replaced it.

3          They've promised to replace it too, but they won't

4  say when, and they haven't.  It's only 2,000 pages, they should

5  be able to replace it.  But we're entitled to everything that

6  we've asked for.

7          And I'm happy to address any of the arguments or go

8  through one by one and argue why each one of the requests are

9  relevant and necessary for XYZ to defend its case.

10         THE COURT:  Well, if we have to do that, we will, but

11 I'm not going to ask you to do that now.

12         Let me hear from Mr. Miller.

13         MR. MILLER:  There is just one point.  I know that

14 you want us to go confer, so I don't want to go through

15 everything that he just said, but there is just one point that

16 is absolutely important.  Which is, we have complied with the

17 OCR native format requirements.

18         We produced in the usable form as we would have

19 expected.  We've never deviated from that.  Now, had we not

20 done so, our production would have been over 100,000 pages

21 because that's what happens if you just PDF the images of all

22 the different columns of a really robust piece of data.

23         The reason why our production, which is actually

24 4,000 pages, which includes a lot of internal marketing --

25 sensitive marketing materials that they've asked for that we

1    gave them, the reason why it's 4,000 pages rather than 100,000

2    pages is because we actually produced it in native format.

3            But we're happy to go in the hallway with these

4    gentlemen and try to narrow the issues further, but it's just

5    not -- the representation that we've not produced -- we've not

6    complied with our discovery obligations, is not correct.

7            THE COURT:  Well, thank you.  It's very hard for me

8    to understand exactly what's going on here because I have very

9    experienced counsel.  And, frankly, you're more technologically

10   savvy than I am.  And clearly Mr. Newman is representing that

11   what he has got is not searchable, is not in the native format,

12   and has not been produced pursuant to the joint discovery plan.

13   And you're telling me exactly the opposite.

14           And so, only one of those things can be accurate.

15   And so, it means one of the three of us is not understanding

16   what's going on.

17           So perhaps talking to each other to determine what it

18   is that's already been produced would be helpful in narrowing

19   or eliminating that particular issue.  It certainly sounds to

20   me like both counsel are articulating that they understand

21   there is an obligation and that it is appropriate to produce

22   documents in a way that is easily searchable and manipulable by

23   the other side so that they can look at what they have and

24   understand it.

25           MR. NEWMAN:  Your Honor, yesterday my colleague and

1    my friend here to your left met and conferred about this.  The

2    confirming e-mail I have from our firm to its firm talks about

3    how the production didn't include metadata necessary to load

4    the images and texts into Relativity.  We asked if they would

5    provide that.  We didn't receive a response.

6            We also on that call showed them examples of

7    documents that were illegible, that couldn't be read.  They

8    said they would replace them.  We haven't received them.

9            We've had our discovery requests outstanding for

10   almost as long as they have.  We served ours a week later.

11   We've received almost nothing.  Meanwhile, we have a team of

12   lawyers around the clock producing documents that are all

13   relevant, there is 134,000 of them.  We have logs as to what

14   each of them are by Bates number.  When they've requested

15   certain documents, we've culled them out.

16           In our reply brief the Court will note that we

17   responded to every -- or I should say our opposition, we

18   responded to every issue they raised by Bates number so they

19   could confirm that they had it.  They're making a motion to

20   compel on documents they have.  We identified them by Bates

21   numbers.

22           Whereas we're making a motion to compel because we

23   don't have anything.  They are not identifying Bates numbers.

24   They are not cooperating.  Where are the 65,000 documents that

25   VeriSign's lawyer estimated that they would produce.  We don't

1    have any e-mails.  We have nothing from VeriSign about what

2    went on internally.  We don't have any e-mails about how they

3    are concerned about these new domain names in general and

4    Negari in particular and about the advertising campaigns that

5    they complain about.  We can't defend the case without them.

6    We just want VeriSign to respond to the discovery that we

7    served.  We're running out of time, and we've produced

8    everything we have.

9         THE COURT:  All right.  Well, I am going to ask you

10   all to go out and discuss these issues so that you can come

11   back and articulate to me a little bit better where things

12   stand with regard to the ESI.

13        I would also like you both to be prepared to go

14   through the outstanding discovery so that I can understand what

15   either has been produced or is going to be produced and exactly

16   what the timeline is, or if VeriSign is standing on its

17   objections, what is being withheld.  Okay?

18        MR. NEWMAN:  Yes, Your Honor.

19        THE COURT:  Thank you.

20        MR. MILLER:  Thank you.

21        THE COURT:  Thank you.

22        NOTE:  At this point a recess is taken; at the

23   conclusion of which the hearing continues as follows:

24        MR. MILLER:  Your Honor, I think I can summarize

25   where we are.  Mr. Newman can correct me if I misstate it.

1          But what we would do is we would agree to an order

2     entering today that would require VeriSign, us -- let's talk

3     about us first.

4          We've been telling Mr. Newman that we're going to be

5     producing documents.  And so, what we have agreed is that we

6     will be completed with all of our document production within

7     three weeks.  So that's the first point.

8          The second point is, we're not going to wait, of

9     course, until three weeks.  We're going to move as quickly as

10    possible and begin document production on a rolling basis --

11    we're going to continue our document production on a rolling

12    basis.  So next week there will be a production, the week after

13    that there will be a production, and all documents that we have

14    agreed to produce will be produced no later than three weeks

15    from today.

16         So that's the first element of the order.

17         THE COURT:  Okay.

18         MR. MILLER:  Okay.  The second element of the

19    order -- let me now shift to like our motion against them.  We

20    weren't able to get the lawyer, Mr. Linky, on the phone, he's

21    in California and he is the person who is most knowledgeable

22    about -- like some of the specific questions.  Like we're

23    asking for these specific e-mails.  And we are concerned that

24    we're not getting production of these e-mails that we need for

25    the deposition.  We're just not going to be able to get the

1    answer -- I know Your Honor has a scheduling issue.  We're just

2    not going to be able to get the answer right now.  But we think

3    it might make sense that, you know, we'll get -- we'll try to

4    drill down and narrow those issues.  We'll all be meeting on

5    Monday at the deposition of Mr. Negari anyway.

6            What we would request, and subject to the Court's

7    schedule, is that maybe we keep our motion to compel open and

8    we have a phone call with you either Tuesday or Wednesday

9    depending upon your availability.  If we were able to call in,

10   we can then report status with the anticipation that we should

11   be able to narrow the issues and maybe only have a couple

12   things left.

13           THE COURT:  Okay.  Mr. Newman, is that your

14   understanding of where things stand?

15           MR. NEWMAN:  My understanding is the Court will grant

16   XYZ's motion to compel requiring VeriSign to produce within

17   three weeks and a rolling basis until then.  And that

18   VeriSign's motion won't be granted or denied, it will remain

19   open so that I can answer VeriSign's questions about where

20   particular documents are.

21           THE COURT:  Okay.

22           MR. MILLER:  Okay.  My colleague is just telling me

23   to make clear that we've agreed to this, but it's not that the

24   motion -- every single thing in the motion to compel is being

25   granted wholesale, it's just as we've stated it.

1        THE COURT:  I understand that.  Part of the problem

2  is one of timing.  And both parties have been saying

3  repeatedly, we're not objecting to a particular area, but we

4  also acknowledge we haven't produced it yet.  And what I

5  understand you're saying is that you are committing to a

6  rolling production that will have a final end date three weeks

7  from now.

8        MR. MILLER:  Yes, all the documents that we say that

9  we are going to produce will be produced --

10        THE COURT:  Correct.

11        MR. MILLER:  -- on a rolling basis --

12        THE COURT:  Let me this question.  And I accept that

13  and I will order that, and that's now part of the record.  So

14  that three-week deadline is imposed on VeriSign.  And to that

15  extent, the motion is granted.

16        To the extent that there are documents that should be

17  produced to which there is no objection lodged, VeriSign must

18  produce them at the earliest possible date no later than three

19  weeks from today.

20        MR. MILLER:  Correct, on a rolling basis.  And so

21  we'll --

22        THE COURT:  So that motion is granted in part.

23        Now, while we are here, to the extent there are

24  specific categories on which VeriSign is standing on an

25  objection and believes that it is not relevant or it is

1   overbroad, and XYZ, as XYZ has put in its papers and Mr. Newman

2   has said today, is seeking all of the documents that it has

3   asked for, it doesn't sound to me like they have withdrawn any

4   of those requests, are there specific issues, categories which

5   we can address right now and I can rule as to whether or not

6   they need to be produced or not?

7          MR. NEWMAN:  Your Honor, XYZ is happy to argue today

8   or attempt to resolve it with VeriSign and confer on it later.

9   We do request every document that we have requested thus far.

10  And we don't agree with any of VeriSign's objections.

11         VeriSign's counsel just suggested that we continue to

12  meet and confer on it.  And I am willing to do that, especially

13  because we are going to see each other in person on Monday, but

14  I just want the record to be clear that all the issues raised

15  in our motion remain open.  The Court has granted it in part,

16  and the remaining part should remain open, Your Honor.

17         THE COURT:  Very well.  I'm certainly not going to

18  force the parties to resolve those differences if you can do it

19  bilaterally, which, frankly, is the way I think everyone would

20  have preferred to have it done without getting to this point.

21  So I'm not going to unnecessarily make us go through each

22  category.

23         This is what I am going to do, however.  In light of

24  what counsel has represented, I am going to grant in part the

25  defendants' motion to compel.  I am going to grant it with

1   respect to the timing and requirement of production as counsel

2   have represented.  That it will be on a rolling basis.  That to

3   the extent documents are available and capable of being turned

4   over, they will be turned over at the earliest possible time,

5   and it will be complete no later than three weeks from today.

6          I understand that the defendants have as of yet not

7   withdrawn, or compromised, or agreed to narrow in any

8   particular respect their requests.  I don't think that is a

9   wise legal strategy, and I would encourage you to think very

10  carefully about what it is you need.

11         I am not going to make a ruling right now, but I will

12  suggest that looking at this, there are many categories where

13  it is appropriate for the defense to have sought the

14  information.  For example, issues having to do with a defense

15  of unclean hands or the notion that VeriSign was engaged in

16  similar advertising, or discount, or free pricing seems to me

17  an appropriate area.

18         Again, I'm not ruling, but I'm suggesting that where

19  you can tie your request to specific legitimate defenses that

20  are relevant to the claims at issue, that there is a basis for

21  producing that.

22         To the extent they are wildly overbroad or

23  speculative as to something that may lead to something that may

24  lead to something that could be relevant, maybe you want to

25  rethink your demand.

1           And likewise, as you've both discussed, you raised

2     the issue of every document related to .com, which means

3     essentially every e-mail in existence since the beginning of

4     time, I'm sure that's not what the plaintiffs intended.  What

5     they are trying to seek is information, as they've articulated,

6     about specific factual representations, the number of people

7     that have been registered, the scarcity of .com names

8     available.  These are the false statements that they have

9     alleged that seem to be the heart of their complaint.

10          Figuring out how to identify those documents and

11    those documents talking about VeriSign seems to me a logical

12    and common sense way to understand that request.

13          The idea that somebody would want every document that

14    has the suffix .com in it strikes me as preposterous.  There is

15    nothing they could do with that.  It's not relevant to all the

16    claims.  It is about the notion of .com as a top domain level

17    and the advertising and potential competition between the

18    entities.

19          So again, I'm not ruling on substance.  I'm trying to

20    give you a framework to think about how you may narrow your

21    requests.

22          Likewise, to the extent there are specific areas that

23    you object to that are not part of this production that you're

24    making, I want that to be made very clear so that we can

25    crystalize amongst the 94 requests for production of documents

1   what is really at issue, what you really need, and what you

2   really think is overbroad or not relevant.  Because there was a

3   lot of talking past each other in these papers, and I think we

4   could have avoided a lot had those discussions taken place in a

5   more comprehensive way.

6           So I appreciate that you are making the effort now

7   and we are going to hold these matters open.

8           With regard to the plaintiff's motion, I am happy to

9   try and address specific issues if they are not worked out as a

10  result of the deposition.  And it may be that being in one

11  place together will allow you to focus on what it is you are

12  missing.

13          I understood to a certain extent that Mr. Newman was

14  making certain representations about the universe of e-mails,

15  either that they have been produced already and you may not

16  have identified them or be aware of them, or they simply don't

17  exist.

18          And, of course, there is nothing I can do to grant a

19  motion to produce documents that don't exist.  I will say

20  this -- and I'm going to finish in one second.  On the issue of

21  ESI, clearly you recognize that you must produce documents in a

22  format that both sides are capable of looking at, whether it's

23  Relativity, whether it's some other database, you can talk to

24  each other and figure out the best mechanism for providing it

25  in a native file format, or in Excel if it is Excel, or if it

1   is OCR readable.

2          I will say this.  I cannot understand why 40,000

3   pages of single PDFs of an Excel spreadsheet would be produced.

4   I cannot think of a logical and rational reason for doing that.

5   It should not require the other side to say, now give it to me

6   in a format that I can use it.  If it is in fact gibberish and

7   unusable is the same thing as not producing it at all.  And

8   everybody has an obligation to try and reduce costs and be

9   efficient.

10          So what I want you to do is to make sure that you

11  produce things after discussion in the appropriate native file

12  format or in a standard loadable form that is consistent with

13  whatever database you are using.  And if there is a problem,

14  you can bring it to the Court's attention, but that problem

15  should only arise if you have had a good faith conversation to

16  make sure that it's being provided in the first instance in a

17  way that is searchable and understandable.

18          For example, with regard to the outstanding motion to

19  compel, if e-mails are there, but they're in PDF format, or

20  they're not searchable, or it's not possible for them to put

21  all of Mr. Negari's e-mails in an easily findable place, then

22  you've got to think about the way that was provided.  To say,

23  I've given 124,000 pages of documents and you have all the

24  e-mails and they have no idea where they are, is simply playing

25  games.

1          And so, I will suggest that you talk to each other.

2     One way to solve that is to provide it in a form that they can

3     search and find it themselves.  Another way to do that is to

4     provide all of the Bates ranges of where the Negari e-mails

5     are.  So that if you represent, I've provided all the e-mails,

6     and there are hundreds or thousands of them and they think

7     there are only six related to Donuts, Inc. or whatever it is,

8     there is an answer to where those are, and they should be able

9     to find them.

10          Do you understand?

11          MR. NEWMAN:  Yes, Your Honor.

12          THE COURT:  And that applies to both sides.  It

13    applies to the e-mails that plaintiff is providing as well.

14          And so, with those recommendations or admonitions, I

15    want to make sure that if we have future discovery disputes,

16    that the party who is bringing the motion represents not only

17    that there has been a meet and confer as is already required,

18    but there is a description of the meet and confer.  And that it

19    is not done by e-mail.  And that it is not done 24 hours or

20    even 48 hours before the hearing or before the motion is filed.

21    It needs to be at least a week in advance, and it needs to be

22    speaking by telephone, and it needs to be lawyers who have a

23    full understanding of the case and the capacity to be able to

24    answer the questions about where the discovery is.

25          And that needs to be in the motion if the parties

34

1   can't work it out.  And I will impose costs the next time we do

2   that if we can't figure out a way to sufficiently communicate

3   beforehand.  I am confident that you all can do this.  But

4   there's clearly been some talking past each other.

5           MR. MILLER:  Thank you, Your Honor.  Those points are

6   incredibly helpful, so we will work very hard to execute on

7   those instructions.

8           I just had a couple quick questions.  So could we get

9   on your calendar for like say Tuesday and Wednesday or a day

10  that --

11          THE COURT:  Yes.

12          MR. MILLER:  -- maybe Wednesday morning?

13          THE COURT:  And the best way to do that is to call

14  Ms. Genti or Ms. Gharbieh in my office and we can find the time

15  that works.

16          MR. MILLER:  Okay.

17          THE COURT:  I will be in the office next week.  I

18  have various matters on the calendar.  Wednesday morning may be

19  difficult, but I could do probably Wednesday afternoon.

20          MR. MILLER:  Okay.  We will work through your office

21  to find a convenient time --

22          THE COURT:  You can work that out and find a time.

23          MR. MILLER:  -- and we'll schedule that.

24          THE COURT:  And that would be to resolve any

25  outstanding issues regarding the plaintiff's motion --

1          MR. MILLER:  Correct --

2          THE COURT:  -- which is being held in abeyance.

3          MR. MILLER:  And we will work very hard to execute on

4    those recommendations and instructions that you just gave us,

5    and maybe we can solve it and won't need the phone call, but

6    maybe we will, and I just wanted to have an opportunity

7    before -- not to have to wait until Friday given where we are.

8          THE COURT:  Yes, that's fine.

9          MR. MILLER:  Then, just two more quick points.  I

10   wanted to let you know, Your Honor, that there are nonparty

11   subpoenas around the country that are being -- some of them are

12   being litigated.  In other words, there are motions to

13   compel -- there is a motion to compel that was filed in

14   Seattle.

15         THE COURT:  Right, that's the Donuts, Inc.

16         MR. MILLER:  Donuts.  I anticipate that there might

17   be two or three other motions to compel filed as to nonparties

18   in various states around the country.  I just wanted to give

19   you the heads-up that that's occurring.

20         Sometimes because no court moves quite as swiftly as

21   this court, it will be clear that the time for discovery will

22   come and go before some court somewhere far away may ever

23   consider it.  So I believe that in many instances, if not all,

24   we will ask for transfer to this court.

25         Now, I was talking to Mr. Reilly and a couple other

1    folks who said that because this rule is new, Rule 45 subpoena

2    is relatively new, and there have been some informal procedures

3    percolating up and that I should at least tell you that this is

4    occurring and about the pendency of the motion to transfer

5    venue, and somebody had suggested that there might be phone

6    calls possible between courts.  I just don't know -- I'm not

7    asking you to give us advice, I'm just letting you know that

8    this is occurring and see if you have any further instructions

9    on that score for us.

10          THE COURT:  I appreciate you letting me know.  I

11   don't have any further advice.

12          MR. MILLER:  Okay.

13          THE COURT:  I am familiar with the issue in the

14   abstract, and certainly hear third-party subpoena motions to

15   quash for matters that have arisen in other districts.  You

16   know, to the extent there is a mechanism to have those

17   transferred and resolved here so it can be done more

18   expeditiously and can be done by the court that is dealing with

19   the issue fundamentally, I'm certainly open to it --

20          MR. MILLER:  Okay.

21          THE COURT:  -- to the extent the rules permit it.

22          MR. MILLER:  Okay.

23          THE COURT:  You know, I can't speak for a judge in

24   another part of the country --

25          MR. MILLER:  Understood.

1          THE COURT: -- who may get the motion and, you know,

2     look at whether he or she wants to retain jurisdiction over it

3     or not. But I appreciate the heads-up.

4          To the extent that there is some relevance to whether

5     the home court is willing to do it, certainly you can let me

6     know if that's something that needs to be communicated.

7          MR. MILLER: Okay. I'll report back on that. And

8     then the final point, I just want for clarification because

9     there was a statement made this morning about we didn't, we

10    VeriSign didn't produce in a particular electronic format, that

11    I just need to -- I need to make a statement for the record to

12    set the record straight.

13         The request about reproduce the stuff that wasn't

14    produced in a readable native format related to Web sites of

15    the defendant. And we have offered to make those available.

16    We didn't know whether he wanted an HTML or native, other type

17    of native OCR format. We are going to do that.

18         With respect to VeriSign documents, like our internal

19    documents, every single one of them in all instances were

20    produced in accordance with the electronic protocols, that they

21    were in native format like the Excel spreadsheets and the

22    e-mails and what not.

23         I just wanted to make that clear because when we met

24    and conferred about it, counsel recognized that it was limited

25    to the defendants' Twitter feed and Web site that he was

1   requesting, and we're happy to do it.  It did not relate to

2   VeriSign documents.  It is very important because, you know, we

3   took very painful and expensive steps to make sure that we were

4   complying in terms of producing VeriSign documents properly,

5   and we have done so, and we have done so in every instance.

6   And I wanted to make the record clear on that.

7          THE COURT:  Well, I appreciate that.  And I think the

8   clarification that I've provided regarding my expectation of

9   both parties with regard to ESI hopefully should eliminate

10  future confusion or disputes over that.

11         Have I addressed everything that needs to be

12  addressed for the time being?  I realize it leaves certain

13  matters open, but I'm hoping that with further communication

14  you can either eliminate or reduce matters in dispute further.

15         MR. NEWMAN:  For XYZ, yes, Your Honor.  Thank you

16  very much.

17         THE COURT:  Thank you.

18         MR. MILLER:  Thank you.

19         THE COURT:  Thank you.  Court is in recess.

20         NOTE:  The hearing concluded at 11:47 a.m.

21         ------------------------------------------------

22

23

24

25

1

2          C E R T I F I C A T E  of  T R A N S C R I P T I O N

3

4

5          I hereby certify that the foregoing is a true and

6    accurate transcript that was typed by me from the recording

7    provided by the court.  Any errors or omissions are due to the

8    inability of the undersigned to hear or understand said

9    recording.

10

11          Further, that I am neither counsel for, related to,

12   nor employed by any of the parties to the above-styled action,

13   and that I am not financially or otherwise interested in the

14   outcome of the above-styled action.

15

16

17

18

19

20                    /s/ Norman B. Linnell

21                    Norman B. Linnell

22                    Court Reporter - USDC/EDVA

23

24

25