1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
VERISIGN, INC.,                :
             Plaintiff,        :
                               :
     vs.                       :  Case No. 1:14-cv-1749
                               :
                               :
XYZ.COM, LLC, et al.,          :
             Defendants.       :
                               :
-------------------------------:
```


HEARING ON MOTIONS


July 17, 2015


Before:  Michael S. Nachmanoff, Mag. Judge


APPEARANCES:

Randall K. Miller and Taylor S. Chapman,
Counsel for the Plaintiff

Timothy J. Battle, Counsel for the Defendants

1          NOTE:  The case is called to be heard at 10:12 a.m.

2    as follows:

3          THE CLERK:  VeriSign, Incorporated versus XYZ.com,

4    LLC, et al., case number 14-cv-1749.

5          MR. MILLER:  Good morning, Your Honor.  Randy Miller

6    for VeriSign.

7          THE COURT:  Good morning, Mr. Miller.

8          MR. MILLER:  I am here with Taylor Chapman.

9          MS. CHAPMAN:  Good morning, Your Honor.

10         THE COURT:  Good morning.

11         MR. BATTLE:  Timothy Battle for the defendants,

12   XYZ.com and Daniel Negari.

13         THE COURT:  Good morning, Mr. Battle.

14         So this matter may be somewhat more complicated than

15   the last matter, although I'm not sure that it needs to be.

16   This comes on plaintiff's motion to redesignate documents that

17   were designated as attorney's eyes only by the defendant.

18         MR. MILLER:  Correct.

19         THE COURT:  But as the protective order contemplates,

20   it really places the burden on the defendant as the designating

21   party to justify the extremely high burden of having restricted

22   the availability of those documents to a very limited number of

23   people.

24         So I've received extensive briefing, as is always the

25   case in this matter.  And I have some questions.  Mr. Battle, I

1  think I need to direct them to you.

2      So first of all -- and I'm not sure that you're going

3  to be in the best position to answer them, but we don't have

4  Mr. Newman here.  Of the total number of documents produced,

5  can you estimate how many were designated attorney's eyes only?

6      MR. BATTLE:  I believe I can, Your Honor.  Let me

7  offer a qualification first.  It is somewhat difficult, even

8  for someone with the best intent, to describe the number of

9  documents because there are chains of e-mails, there are a

10  document that may have 20 parts that takes up 27 pages.

11  Whether that's one or 20 or 27, the most honest and

12  well-intentioned person may have trouble coming up with a clean

13  number.

14      But there is -- there is a large number of documents

15  that have been designated attorney's eyes only.  And the reason

16  is -- my best estimate, with the qualification that it's not

17  scientifically accurate, is perhaps 20 percent of the

18  documents, 25 percent.

19      THE COURT:  So that would be thousands rather than

20  hundreds or dozens, is that correct?

21      MR. BATTLE:  Yes, sir.  By any standard, thousands

22  would be, would be -- that's fair.

23      THE COURT:  Okay.

24      MR. BATTLE:  But the context is important here.  As

25  the Court has heard on several occasions, VeriSign is an

1    enormous company with massive resources.  XYZ.com and its

2    president, Daniel Negari, is a much smaller company, it's a

3    start-up company that has had to hire third-party contractors

4    just to deal with the discovery requests, which are extremely

5    broad.

6              Judge, we have had -- in this case there are a dozen

7    third-party subpoenas all over the country.  Four of those have

8    resulted in litigation on the scope of what should be

9    available.  And it is obviously a challenge, it's a challenge

10   to be in this court, which is efficient and fast and is the

11   Alexandria Federal Court, the Rocket Docket.  It's also a

12   challenge when these third-party subpoenas show up all over the

13   country directed to third parties like Mr. Negari's accountant,

14   like other big companies, and --

15             THE COURT:  I don't mean to interrupt, Mr. Battle,

16   but I would like to refocus it on the very simple issue --

17             MR. BATTLE:  Okay.  If I --

18             THE COURT:  -- of whether or not the documents -- and

19   we can talk about the eight documents as opposed to a greater

20   number of documents we don't have before us.

21             MR. BATTLE:  I understand.  Okay.

22             THE COURT:  How that issue relates to whether the

23   defense has provided sufficient justification for keeping those

24   eight documents at the highest level of restriction.

25             MR. BATTLE:  I believe we have, Your Honor.  And to

1  conclude my point that I think is very responsive to the

2  Court's question, on page 2 of our opposition there is a quote,

3  which is the portion of the protective order which was

4  negotiated and discussed in this court a month or two ago.  And

5  it starts with A:  Sensitive information relating to research,

6  development, or production of products or services.  I won't

7  read the whole thing.

8          It goes down to item E, like in Edward:  Such other

9  documents, information, or material which contains confidential

10 information that the producing party reasonably believes is of

11 such nature and character, the unauthorized disclosure of such

12 information is likely to irreparably injure the producing

13 party.

14         Now, here is an example.  VeriSign has a particular

15 form for its customers, and the customers can either opt in or

16 out.  There is one form over and over.  You can't change the

17 language.  If you don't like the language, you're out.  It's

18 opt in or opt out.

19         VeriSign has designated that form agreement, which

20 they've given to us hundreds or thousands of times -- that gets

21 into how hard it is to count the correct number, it's the same

22 form over and over.  They have designated that as attorney's

23 eyes only.  And we haven't contested that, even though it's the

24 same form over and over and over again.

25         In our case, what we have is, and these documents are

6

1    typical, is particular agreements with customers, exact prices,

2    exact terms that have -- are far, far afield from this case

3    which grows out of an interview Mr. Negari gave and one video

4    with an old crummy car and a new sports car.

5            And previously, and it will come up again, there is a

6    motion for summary judgment on the fact that VeriSign has no

7    damages, that this couldn't possibly have affected a huge

8    company like this.

9            However, the discovery is extremely broad, including

10   12 third-party subpoenas looking for massive documents.  And

11   this protective order was not a sort of routine thing, it was

12   of great importance, and it is something that was negotiated at

13   a two-tier level instead of one.

14           The Court also learned in one of the first hearings

15   that until this matter, VeriSign had never ever used a

16   one-tier, they had always used a two-tier in the eight or

17   nine cases we found where there was a record, always used this

18   format.

19           THE COURT:  Let me try and refocus the argument a

20   little bit here.  And I remember very well the litigation over

21   the protective order.  And it is absolutely correct that this

22   is the language from the protective order that defines what

23   category of documents could be designated as attorney's eyes

24   only.

25           But the question is not whether or not the initial

1    designation in producing this information was appropriate.  The

2    question now is whether or not there is a justification in

3    balancing the strong presumption in favor of transparency and

4    public access to information against the possibility of harm in

5    certain information being disclosed.

6           And so, what I'm concerned about is the plaintiff has

7    designated these documents as documents that they potentially

8    will be using in, as I understand it, one of three ways.

9    Either with regard to the deposition of the 30(b)(6) deponents

10   if they're given access and permitted to share them; number

11   two, I would assume that these are exhibits that would be used

12   in connection with the summary judgment motion or opposition to

13   summary judgment; and three, to the extent the matter gets to

14   trial, they would be documents for trial.

15          And so, the question that I think I have to resolve

16   is whether or not this extremely rare designation, which makes

17   it very difficult both for the Court and for the lawyers to

18   manage this information, is appropriate at this stage of the

19   litigation.

20          And so, it is not -- I'm not making any -- it's not

21   before me and I'm not making any finding with regard to whether

22   or not the information that, you know, was produced in response

23   to very voluminous discovery and numbers in the thousands, was

24   appropriate or not appropriate.  It is possible that it could

25   have been appropriate at first, at a first blush to do that.

1          The question is now, with regard to whether or not

2    these documents will be used in a deposition or submitted as an

3    exhibit, they should be, you know, subject to attorney's eyes

4    only, or redacted in some way, or kept in the way they are now.

5          And so --

6          MR. BATTLE:  Your Honor, I will try to address that

7    and be as focussed as I can.

8          First, it would be a proper concern for a United

9    States Magistrate Judge, United States District Judge if there

10   was a prospect that this Court would have to spend three hours

11   a day, four days a week for the next five weeks refereeing

12   things.  Which, despite the fact that the Court has many other

13   cases to deal with, the attorneys should be able to handle the

14   vast majority of this themselves.

15         There have only been four occasions in the six or

16   seven weeks we've had of discovery, and there are depositions

17   going on right now in California, there have only been four

18   occasions where there was a question about documents, about

19   using them in a broader fashion.  And on each occasion within a

20   day or two there was a conversation between someone from

21   Venable on behalf of VeriSign and someone from the Newman Du

22   Wors firm on behalf of the defendants XYZ.com and Mr. Negari,

23   and they worked it on.

24         On three occasions they said, fine, go ahead, we'll

25   change the designation.  In particular, it's come up in these

1    12, and there may be more now, third-party subpoenas, four of

2    which are resulting in litigation in other courts around this

3    country over the scope of these requests.

4           And in particular, there was a request that these

5    other attorneys in this related litigation be able to see

6    everything as if they're from Venable, except they're from

7    Newman Du Wors.  No problem.

8           Also, the particular language already allows the

9    General Counsel for VeriSign, Mr. Indelicarto, who is sitting

10   here at every motion, and their director of litigation is at

11   the depositions in California, they're already in the

12   attorney's eyes only category.  So this already works, and it

13   has not required a lot of work from the Court.

14          As to the three areas the Court identified, usage at

15   depositions, for summary judgment, and at trial.  At

16   depositions, it has not been a problem there going on -- I

17   attended the second deposition of Mr. Negari.  The issue of

18   which documents -- use of documents at depositions has not been

19   a problem.  It won't be a problem in the future.

20          And in particular, the 340-or so exhibits that the

21   plaintiff has identified, of which 200 are in this category,

22   they're being used freely at the deposition.

23          THE COURT:  Okay.  Well, let me just cut to the chase

24   here.  Does the defendant have any objection to the 200

25   currently designated attorney's eyes only documents being

1    shared with the 30(b)(6) deponents who, as I understand it, are

2    not covered by the protective order at this point?

3              MR. BATTLE:  The problem we have, Your Honor, with

4    that is that right now two of the most senior people at

5    VeriSign, the General Counsel seated here and the director of

6    litigation, have access to this.  If all these documents go to

7    the people who do nothing but marketing, nothing but

8    accounting, nothing but trying to grow that business, and they

9    have every single e-mail that Mr. Negari ever wrote, they have

10   every single contract, they have every single agreement --

11             THE COURT:  Well, let me stop you there.

12             MR. BATTLE:  -- then that's a problem.

13             THE COURT:  And I'll speak to Mr. Miller in a moment.

14   But I don't know who the 30(b)(6) deponents are.  They're

15   obviously people at VeriSign who counsel have decided and the

16   company has decided are the appropriate ones to respond on

17   behalf of the 30(b)(6) depositions.  So I don't know where they

18   come from.

19             But certainly in order to be prepared 30(b)(6)

20   deponents, they need to have enough information to be able to

21   respond.  They'll be subject to the protective order.

22             And so, my question is whether or not there is any

23   objection to having those deponents have access to the 200

24   documents that VeriSign has identified?

25             MR. BATTLE:  There is a problem with that, Your

1    Honor, although it is obviously less than opening up thousands

2    of documents.  Because the 30(b)(6) deponents are talking about

3    VeriSign, they're talking about what VeriSign did, they don't

4    need to see private contracts and other matters with XYZ trying

5    to grow its business.

6            But I don't see how these documents are important to

7    the 30(b)(6) deponents, representatives for 30(b)(6) from

8    VeriSign.

9            On the other two matters, quickly, Your Honor, that

10   you asked about.  On summary judgment, I don't think there is a

11   problem at all with the way we've been filing things so far.

12           And for trial, that's obviously a different issue,

13   and that we're not there yet.

14           So again, I would ask this Court to -- I believe the

15   system as of now is working well.  And it is not appropriate --

16   also, finally, of the eight exemplars in particular that this

17   Court has, okay, it is a bad solution to what may not be a

18   problem.  One we've agreed on.  We said, this is fine, this can

19   be a lower designation.

20           THE COURT:  Yes, my understanding is that the e-mail

21   between Negari and --

22           MR. MILLER:  Page Howe.

23           THE COURT:  Page Howe, yes, thank you, is not

24   objected to.

25           MR. BATTLE:  That's correct.

1    THE COURT:  And so, with regard to that document, I

2 will find that it should be redesignated as confidential.

3    MR. BATTLE:  Absolutely.  But, Your Honor, finally,

4 unless the Court has more questions, it is -- to what -- first

5 off, there may not be a problem.  The system is working pretty

6 well.  We have been here on other issues, but not with -- not

7 dealing with a protective order except for this one occasion.

8    But it is a -- while it may not be a problem, it's a

9 very bad solution to have adversaries and business competitors

10 pick eight documents and say, these are typical and, therefore,

11 now we want to redesignate anything that we feel is similar,

12 thousands of items.  That's a very broad and bad solution to

13 what may not be a problem.

14    THE COURT:  I understand your position.

15    Mr. Miller.

16    MR. MILLER:  Yes, Your Honor.

17    THE COURT:  With regard to the 30(b)(6) deponents, is

18 it your position that it is necessary for them to have access

19 to all 200 -- I understand that what has been done is the

20 plaintiff has identified a universe of potential trial

21 exhibits.

22    And, of course, Mr. Battle is correct, there are

23 different points in the litigation.  And as I understand it,

24 there was a strategic decision made to disclose these now in

25 order to try and resolve these issues.

1          But it is also correct that what is ruled on with

2     regard to the 30(b)(6) deponents does not necessarily answer

3     the question as to what will happen at trial.

4          MR. MILLER:  True.

5          THE COURT:  So my first question is, do you have a

6     universe of documents or a smaller subset that you feel is

7     critical to the preparation of the 30(b)(6) deponents that

8     right now under the protective order you cannot share?

9          MR. MILLER:  Well, stepping back, I think it's sort

10    of like a funnel process.  The plaintiff -- the defendants have

11    produced over 100,000 pages of material.  There were tens of

12    thousands marked highly confidential.  We obviously didn't want

13    to burden the Court with that.

14         What we did was, in a conversation I had with Mr.

15    Newman, I said, look, here is what I'm going to do.  I'm going

16    to find the 500 or less, hopefully less, documents that I will

17    actually mark as trial exhibits.

18         And so, when the time comes to exchange trial

19    exhibits, it's not going to change.  It's going to be the

20    same -- it's going to be the same documents we used in the

21    depositions.  It will be the same documents we use at summary

22    judgment.  It will be the same documents we use at trial.

23         Because the truth is that most of the stuff that is

24    produced rapidly whittles down to a very small number.  And

25    that's why you have these numbers 308 documents that we've

1   given to them.  We've actually branded it Plaintiff's

2   Exhibit 1, et cetera, and actually given to them.

3           And we said, let's talk about the 200 that are marked

4   AEO.  Can we get all of them from AEO down to confidential so

5   that we can get the benefit of assistance from business persons

6   with knowledge?  Which is what the law says we're allowed to

7   do.

8           And we couldn't really get started with that

9   discussion because the answer was no, all of them are going to

10  stay AEO.  And that's why I thought it might break the logjam

11  if I came in here with some examples, you gave us guidance, and

12  then we could go back.

13          I'm sure that there might be some in the 200 that are

14  truly AEO in the sense that it's -- you know, when you're

15  balancing how trade-secret like is it versus how much do we

16  need to show it to our business people, the party -- the

17  counsel to the parties could probably work that out.  And I

18  imagine that there will be some that we probably won't even

19  bother to challenge.

20          But we couldn't get the conversation started because

21  I was kind of told that all this stuff, all of this material

22  was essentially a trade secret.

23          And with, you know -- and I had sort of identified

24  the two buckets that the exemplars fall into.  One is relating

25  to the Network Solutions transaction.  Which it's laid out in

1   our reply brief that is kind of in the public domain anyway,

2   and Mr. Negari is making public statements about the terms and

3   conditions of that anyway.

4          And we're going to be taking, for example, the

5   Network Solutions rep.  And I asked opposing counsel, Mr.

6   Newman, hey, is it okay if I show Network Solutions-related

7   communications to that witness, it's been marked attorney's

8   eyes only, which is currently -- he's not part of that crowd.

9   So I can't even show the witness who participated an e-mail

10  that, you know, that relates to that transaction.  And I could

11  not get an answer to that.

12         So currently there is this witness coming, but I

13  might not be able to show Network Solutions-related e-mails.

14         The Network Solutions/XYZ transaction was the subject

15  of significant publicity in which Mr. Negari participated and

16  made statements.  And we think it's kind of--  I don't want to

17  say water under the bridge, but it's kind of like a well-known,

18  the terms and conditions are well known.  That Network

19  Solutions had to communicate to the public to stuff these

20  hundreds of thousands of domain names.  And so, the opt-out

21  e-mail is publicly known, there are articles written about it,

22  I have attached it to the reply brief.

23         So in terms of balancing trade secret protection

24  versus functional working of a litigation team with

25  participation of certain business people with knowledge, I

1    think the balance on Network Solutions-related transactions

2    should fall in favor of lowering the designation.

3              But with respect to these e-mails that are sent from

4    XYZ out to -- the way this works is XYZ is the registry and

5    they community with these registrars, like Network Solutions,

6    who then in turn sell the domain names to people, to

7    individuals and businesses.

8              And there is a lot of these e-mails that are just

9    sent unsolicited, they have sales pitches to people that are

10   not under an obligation to keep it secret.  And it contains

11   statements, characterizations that we're challenging in this

12   case.

13             And so again, when you're looking at the balance, you

14   know, e-mails sent to third parties with no protection versus

15   our -- we do have under the case law the right to go to talk to

16   certain business people with knowledge.

17             And it is true that Mr. Indelicarto is part of the

18   AEO, but he and I have talked about this, we're not -- we don't

19   know, we don't have the sort of technical knowledge to look at,

20   for example, the Network Solutions agreement and determine

21   whether it's fair or standard.

22             One of the issues in the case is whether or not

23   Network Solutions' transaction was structured as what they call

24   round-tripping, money going back and forth.  And it's like a

25   fake, fake revenue, fake advertising spending.  And there are

1    people at VeriSign who would know immediately, but we can't

2    even discuss it with them.

3         We have extraordinary procedures to comply with the

4    protective order currently.  I can't even -- I won't even

5    e-mail Mr. Indelicarto AEO documents because it might get into

6    the system somehow and somebody might inadvertently get it.  So

7    we hand deliver things.  And we have face-to-face meetings.

8         And we never -- and the two or three or four people

9    that are going to be witnesses in the case ask us what the case

10   is about, and we can't even -- we can't even talk to them about

11   the case because the core, the core documents, aside from Web

12   site printouts and newspaper articles, are AEO.

13        So we think, you know, maybe earlier in the case it

14   was okay to keep all those tens of thousands of materials AEO.

15   Now we're coming up to the end of the discovery period.

16   Discovery cuts off August 14.  We only have a couple more

17   weeks.  A lot of activity is occurring, there are expert

18   depositions, the fact witnesses, all the VeriSign witnesses are

19   about to be deposed.

20        And again, we haven't had -- I worry about talking to

21   them about the case because what if I inadvertently mix in AEO,

22   a reference to an AEO document?  VeriSign has instructed me to

23   steer as far from any kind of infringement of the protective

24   order as possible.

25        So as a consequence, I have to do these hand

1    deliveries, these face-to-face meetings.  And then I haven't

2    had any substantive discussions with the people who are going

3    to be witnesses because of this concern.

4            So my thought is, if you can give us some instruction

5    as to perhaps the rarity and drastic nature of AEO, an

6    instruction to go back and look at the 200 documents possibly

7    in light of your ruling that would redesignate the eight

8    exemplars down to just confidential, we could probably make a

9    lot of progress.

10           Redesignating data confidential does not mean we get

11   to show it around, or publicize it in any way, or talk about

12   it.  It's still protected, we're still under an obligation --

13   when something is marked confidential, we're obligated to use

14   it only for the purpose of litigation and for no other purpose.

15           And so, we would have controls and procedures to make

16   sure that people don't take copies with them.  We would have --

17   you know, in other words, it would be a controlled process

18   because we want to steer clear of the kind of concern that is

19   being expressed.

20           But we think that in light of the burden that the

21   defendants have, the drastic and rare nature, the need, the

22   obligation of the process to allow us to consult with business

23   people with knowledge so that VeriSign, the party, can

24   participate in the prosecution of this case, that the eight

25   exemplars ought to all come down to confidential.

1          THE COURT:  Thank you.

2          MR. BATTLE:  Your Honor, briefly.  We accept that the

3   attorney's eyes only designation is a special category that's

4   not to be abused or not to be stamped without a good deal of

5   thought, but in this case we have competitors against each

6   other.

7          And three particular points that counsel made.

8   Technical knowledge is needed.  This is not about -- this is

9   not a patent case.  This is about marketing.  This is about who

10  are you talking to?  This is about, how much are you charging?

11  How much are they paying you?

12         This is not a matter that this Court has to deal with

13  sometimes with the prehearings on the computer circuitry that

14  even experts struggle with.  This is marketing, this is sales,

15  this is customers, this is selling things.

16         And already involved in the attorney's eyes only

17  category is Mr. Indelicarto, who is the General Counsel for the

18  entire company, all of VeriSign; and the director of

19  litigation, who is at the depositions now in California.  Those

20  are very smart people, at the top of the pyramid.  They don't

21  need some engineer to -- and a term like round-tripping is

22  something -- it's a term everyone knows.

23         Second, the depositions have been good so far.  There

24  have been -- there are multiple depositions going on now.

25  There have not been particular problems.  They are going on

1   smoothly.  This Court is not hearing phone calls from either

2   side saying, help us, we're stuck, or we're not getting any

3   progress.

4           Finally, face-to-face meetings between Mr.

5   Indelicarto and Mr. Miller.  Well, it's obviously important to

6   the company because the General Counsel is at every motion and

7   he's at a lot of the depositions.

8           And one last example before I thank the Court for

9   your time and sit down, unless there are more questions.  One

10  of the documents that said something along the lines of why is

11  -- why is -- why is XYZ making progress in China?  We're not

12  getting anywhere in China.  And what's going on here?

13          And then those questions at the deposition that I

14  attended, the redeposition of Mr. Negari, there are lots of

15  questions about what are you doing in China?  What's going on

16  in China?  Who are you talking to in China?  Pretty far afield

17  from the allegations of this case.

18          And now -- and I hope, I hope I don't mess this up,

19  there is a -- there is a -- on the Internet, just since this

20  case has started, where XYZ was in a top position on one of the

21  Web sites, now VeriSign has moved into the top position.

22          Now, that could have happened by other reasons.  It

23  could have happened because they did something smart because

24  they finally made some inroads, but that's the sort of thing

25  that we're dealing with, Your Honor, on a very practical basis

1  every day.

2          And we believe that the system as it is in place

3  right now is working, and that the language cited for the

4  things that are in attorney's eyes only is appropriate.

5          Thank you.

6          THE COURT:  Thank you.

7          MR. MILLER:  Could I just briefly address that last

8  point?

9          THE COURT:  Very briefly.

10         MR. MILLER:  I'm sorry, I just -- I need to set the

11  record straight since I'm the one personally responsible for

12  ensuring compliance with the protective order.

13         And I can represent to this Court on no uncertain

14  terms, this China reference that we just heard, there is

15  absolutely no substantiation to any idea that we would take

16  information from this lawsuit and go to China and use

17  information in China.

18         It's part of our case that XYZ did the same type of

19  automatic robo stuffing in China through Xin Net and in Japan

20  through this GMO.  And they did the same type of round-tripping

21  structure.  And that's why we're asking questions about it.

22         We're not using -- we're not replicating what XYZ is

23  doing.  We're coming to this Court and filing a lawsuit saying

24  what they're doing is improper.

25         THE COURT:  I understand.  Thank you.

1          Well, this matter comes on the plaintiff's motion to

2     redesignate.  And it is important, I think, to recognize that

3     although it is the plaintiff's motion, the burden really falls

4     on the defense to justify the attorney's eyes only designation.

5          And it was clear from the start of this litigation

6     that although a two-tiered protective order was appropriate,

7     that the Court was concerned and the case law is overwhelming

8     that attorney's eyes only should not be used except in the

9     rarest of circumstances.

10          And so, to have a case in which there are thousands

11     or even tens of thousands of documents that have been

12     designated that level, is of some concern.

13          As I said earlier, I'm not concerned about whether or

14     not those initial designations were made correctly, but now

15     that the plaintiff has identified, beginning with these eight

16     documents specified, the burden shifts to the defense to make

17     clear that there is really going to be the kind of significant

18     harm that can't be addressed in other ways even through the

19     restrictions of the confidential designation that require this

20     drastic remedy.

21          And I don't think the defense has met its burden.  It

22     conceded already with regard to number two of the eight

23     exemplars.

24          With regard to the other seven, I find that there

25     simply is not enough information that I have seen to justify

1   the continued designation as attorney's eyes only.  With the

2   exception of Exhibit E, the marketing agreement between XYZ and

3   Web.com, which I think does have a lot of specific and detailed

4   information, and I will give the defense an opportunity to

5   either make an argument that there is information in there that

6   should be redacted and remain attorney's eyes only before it is

7   simply reduced to a confidential label.

8           With regard to the other seven, I will find that the

9   justification has not been met.

10          Now, it is clear and I will reiterate that with the

11  confidential designation, there are many limitations on the use

12  of that document, those documents.  And as I understand it,

13  they will be shared only within the designation of confidential

14  for the purpose of this litigation, and for the purpose of the

15  preparation of the 30(b)(6) deponents, or for pleadings that

16  are submitted in connection with summary judgment, or at trial.

17          I don't think, and I do appreciate the defense's

18  concern, that making a ruling on these particular documents can

19  tell us exactly how a ruling should be made with regard to the

20  other 200.  And so, what I'm going to do is direct both counsel

21  to confer with each other about what really is going to be

22  used.

23          And so, to the extent you know there is a limited

24  subset of these 200 documents, other than these seven, that

25  need to be shown in preparation for the 30(b)(6) deposition or

1  for other discovery that is finishing up in the next couple of

2  weeks, you are directed to share those promptly with the

3  defense so that they can either submit a justification,

4  distinguish them from the rulings that have been made here; or,

5  if necessary, the Court will address those limited documents.

6          Mr. Battle, I appreciate that with the exception of

7  the matters that we've had to deal with in other motions, there

8  has been a lot of collaborative work and that many of these

9  things have been addressed on a case-by-case basis.

10          But, frankly, the plaintiff I think is smart to front

11  load this issue rather than waiting to the last minute.  It is

12  harder I think for everyone to be faced with a document during

13  the deposition and asked at that moment, are you willing to let

14  me use this or are you not willing to let me use it.  And it

15  will simply prolong matters and increase the amount of

16  litigation by waiting until the last minute.

17          With regard to the total universe of 200 documents, I

18  think it's incumbent on the plaintiff to think hard about what

19  will be needed at summary judgment and at trial.  And that

20  there will be enough time, if you identify those, to give the

21  defense the opportunity to justify or work out an agreement.

22          It may be that there are some documents that making

23  redactions of certain amounts or numbers addresses the very

24  particular issues that are most sensitive, but that the

25  document then can be used as a whole.

1          There is a lot of information, especially with regard

2    to the Network Solutions deal, that is out in the public sphere

3    that Mr. Negari talked about with others, with third parties,

4    with the media.  There are references to his own blog postings

5    in which he is responding to the investigation at ICANN and the

6    concerns that have been raised about whether or not there

7    really was a $3 million payment or there really were $8

8    wholesale payments made.

9          And so, it's very hard to justify continuing to keep

10   that information at an attorney's eyes only level.  And there

11   is no question that it's going to be necessary to discuss those

12   issues in the dispositive motions and at a trial.

13          Is my ruling clear to the parties?

14          MR. MILLER:  Yes, Your Honor.  One question.  Did you

15   want us then to confer about that one document you mentioned

16   about whether we should explore possible redactions or other

17   appropriate methods?

18          THE COURT:  Yes.

19          MR. MILLER:  Okay.

20          MR. BATTLE:  Your Honor, I do -- I listened

21   carefully, and obviously have written down what I can, but my

22   understanding is that we're talking about the 200 items that

23   are identified by the plaintiff here, not about allowing the

24   plaintiff to redesignate thousands of items, is that correct?

25          THE COURT:  Well, the plaintiff does not have the

1    authority to redesignate any items.  And the only items before

2    the Court today were the eight specific items that were listed.

3           As I understand it, there is a universe of 200

4    documents.  We're not talking about any documents designated

5    attorney's eyes only beyond those 200.  And there will be a

6    process by which, since the defense has designated those

7    attorney's eyes only, they will need to justify whether or not

8    that designation remains, can remain in effect.

9           Now, if it turns out that they're really only going

10   to use 75 of them or 10 of them for this particular deposition,

11   I'm asking them to prioritize and get those answers not in the

12   abstract of what might happen at a trial in a few months, but

13   what's happening next week or what's happening in a

14   month-and-a-half for summary judgment.  And that way, it can be

15   dealt with in the most efficient way.

16          MR. BATTLE:  I believe I understand.  Thank you.

17          THE COURT:  Thank you.  Let me just finish by saying,

18   this may be a good time for the parties to think about

19   settlement.  I know there has been a lot of litigation here.  I

20   don't know whether or not that would be fruitful.  But, you

21   know, the parameters of the case I think are better understood

22   now than they were a couple of months ago.

23          To the extent the parties think it would be helpful,

24   I would be happy to facilitate a settlement conference.  I

25   don't think it is productive to require a settlement

1  conference.  And if the parties want to litigate this through

2  summary judgment and beyond, they of course are entitled to do

3  so.  And that may well be what needs to happen.

4          But it strikes me that there are compelling reasons

5  on both sides to think about a resolution, especially as you

6  get into the nuts and bolts of the final pleadings on

7  dispositive motions and what might happen at a trial that

8  should encourage both sides to think about the benefits of a

9  resolution through settlement.

10         So if there is an interest, please feel free to

11  contact chambers.

12         MR. BATTLE:  Thank you, Your Honor.

13         MR. MILLER:  Thank you.

14         THE COURT:  Thank you.  Court will be in recess.

15         NOTE:  The hearing concluded at 10:49 a.m.

16  ------------------------------------------------

17  C E R T I F I C A T E  of  T R A N S C R I P T I O N

18         I hereby certify that the foregoing is a true and
    accurate transcript that was typed by me from the recording
19  provided by the court.  Any errors or omissions are due to the
    inability of the undersigned to hear or understand said
20  recording.

21         Further, that I am neither counsel for, related to,
    nor employed by any of the parties to the above-styled action,
22  and that I am not financially or otherwise interested in the
    outcome of the above-styled action.

23

24                              /s/ Norman B. Linnell
                             Norman B. Linnell
25                             Court Reporter - USDC/EDVA