IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| Verisign, Inc., <br><br> Plaintiff, <br><br> v. <br><br> XYZ.com, LLC et al., <br><br> Defendants. | Civil Action No. 1:14-cv-01749 CMH-MSN |

**DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHAEL B. MAZIS AND MEMORANDUM IN SUPPORT**

**Table of Contents**

I. Introduction ................................................................................................................. 1

II. Factual Background ..................................................................................................... 2

    A. Verisign's Complaint alleges false advertising by a new competitor, XYZ. ............ 2

    B. Verisign hired a survey expert to determine whether consumers "understood that the vast majority of domain names within the .xyz registry were given away for free" when reading the Blog Post that did not report anything about purchases. .... 3

III. Argument ..................................................................................................................... 8

    A. The Mazis report is not relevant because it will not help the jury to understand what is already obvious—that the blog post does not inform readers about the number of <.xyz> domain names that were purchased or that were given. .............. 9

    B. The Mazis report is not relevant because it does not address the actual issue relating to the statement—whether it is a false or misleading representation. ....... 11

    C. Mazis's opinions about materiality are speculative, unsupported, and outside of his expertise. ............................................................................................................ 12

IV. Conclusion ................................................................................................................. 14

I. Introduction

Plaintiff Verisign is an industry giant worried that upstart Defendant XYZ will undercut Verisign's long-established <.com> domain name business. Verisign sued XYZ, and its CEO Daniel Negari, for alleged false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a). Among other statements Verisign alleges is false and misleading is an Internet post stating: ".xyz has received the most registrations of all new gTLDs with 447,544 domains registered." Verisign claims that statement deceives consumers into thinking that names *registered* actually means names *purchased*, when at least some of the domains were given away for free by a third party.

Verisign hired a consumer survey expert, Michael B. Mazis, to conduct a survey to determine whether consumers "understood that the vast majority of domain names within the .xyz registry were given away for free and were not purchased by domain name registrants." Based on the survey, Mazis opines that the blog post is misleading "because it fails to inform readers about the number of .xyz domains that were actually purchased." But XYZ concedes that the post does not "inform readers about the number of .xyz domains that were actually purchased." That fact is not in dispute. The statement only states the number of *registrations* (and does so accurately). On its face, the statement does not mention purchases.

Mazis's testimony is not relevant. It will not help the jury to understand the evidence because Mazis merely states the obvious conclusion: the statement does not inform readers whether the domains were purchased or whether they were given away. That is his only scientific conclusion. No survey is needed for that. The jurors can read the statement to see that.

Mazis's survey does not indicate that the statement is *misleading*. When asked specifically what the post communicated, virtually none of the survey respondents indicated any mistaken

1

belief that the number of domain names referred to *purchases* (as opposed to just registrations). The only responses that did were in response to the final question, which specifically asked whether the number referred to domain names that had been "purchased." Mazis did not use any control to account for the tendency of that leading question to generate Verisign's desired response.

Mazis's proposed expert testimony does not satisfy the relevance requirement and should be excluded.[1]

## II. Factual Background

**A. Verisign's Complaint alleges false advertising by a new competitor, XYZ.**

Verisign operates the <.com> domain name. For example, Google uses Verisign's <.com> for its search engine at http://google.com. XYZ operates the competing <.xyz> domain name, which just became available last year. Google's new corporate parent, named Alphabet, uses XYZ's <.xyz> domain name for its website at http://abc.xyz.

Verisign alleges that "XYZ has launched a promotional campaign that is designed to suggest that it is superior to Verisign." (Complaint (ECF 1) at ¶ 16.) Verisign's Complaint identifies several statements that it claims "deceptively inflate the success and desirability of .XYZ as a .COM competitor." (*Id.* ¶ 52.) Verisign alleges false advertising under the federal Lanham Act, 15 U.S.C. § 1125(a)(1)(B). (*Id.*)

The only statement germane to this motion is: ".xyz has received the most registrations of all new gTLDs with 447,544 domains registered." (*See* Compl. 53(b), Ex. 7.) That statement

---

[1] Defendants believe Mazis's testimony should be found inadmissible based on the issues raised in this motion, but reserve the right to challenge his testimony, or portions thereof, at motions in limine or at trial on any other applicable grounds, including reliability.

2

appeared in an Internet website log (known as a "blog") attributed to XYZ's CEO Daniel Negari dated August 20, 2014 (the "**Blog Post**").

Verisign alleges this statement is misleading because "the vast majority of [.xyz domain-name] registrations were given out for free as part of [an] 'opt-out' scheme designed to create the false appearance of success." (*Id.* ¶ 55.) Specifically, Verisign alleges that the Blog Post is misleading because it does not disclose that most of the domain names registered had been given away for free and that only about 70,000 were purchased.

**B.    Verisign hired a survey expert to determine whether consumers "understood that the vast majority of domain names within the .xyz registry were given away for free" when reading the Blog Post that did not report anything about purchases.**

Verisign retained Michael B. Mazis to conduct a survey among individuals who have registered a domain name for personal or small-business use, or who expect to do so.[2] Mazis states that the objective of the survey was to test whether respondents "understood that the vast majority of domain names within the .xyz registry were given away for free and were not purchased by domain name registrants." (Mazis Report ¶ 1.)

Mazis tested two groups, a Test Group and a Control Group. Respondents in the Test Group were shown the authentic Blog Post. Respondents in the Control Group were shown a fake version of the Blog Post with numerous substantive changes and additional content, including the *addition* of the following new statements that never appeared in the actual Blog Post:

- "You may be one of the domain owners who now have a **free** .xyz domain and do not even know it!"

---

[2] *See* June 26, 2015 Expert Report ("Mazis Report") (Derek Linke Declaration in Support of Defendants' Motions to Exclude Plaintiff's Experts ("Linke Decl."), Ex. E); August 12, 2015 Rebuttal Expert Report ("Supplemental Mazis Report") (Linke Decl., Ex. F).

3

- "85% of .XYZ registrations are **free giveaways**."

- "One of our registrars (Network Solutions) picked hundreds of thousands of .COM customers and automatically registered them for the mirror-image .XYZ extension for **free**."

- "Owners may not even realize that they have the **giveaway**."

- "The **free registrations** are in addition to the 70,000 **registrations that customers purchased**."

- "Our hope is that some of the people with a **free give away** will actually start using .xyz."

- "We have **actually sold** approximately 70,000 domain names with .xyz extensions!"

- "That number remains a small percentage of the number of domains registered because of the **giveaway** program, but is a great start."

(Mazis Report, Exhibit D, page 2 (emphasis added).)

Respondents from both groups were asked the same open-ended questions about the main message and other messages communicated by the version of the Blog Post they were shown. (Mazis Report ¶ 24.) For the Test Group (who saw the real Blog Post), Mazis notes the following key responses:

- .xyz having been in operation for a relatively short time (25%)

- Non-specific comments about the domain or site activity (25%)

- .xyz being a popular or successful domain name (23%)

- .xyz having more domain name registrants than competing or other new domains (21%)

(Mazis Report ¶ 32.)

As summarized by XYZ's rebuttal expert, Hal Poret[3]: "None of these responses indicate that respondents were misled by the blog in any way." (Poret Report, p. 12.) The first two

---

[3] August 1, 2015 Expert Report of Hal Poret ("Poret Report") (Linke Decl., Ex. I).

4

categories are unrelated to the alleged deception. (*Id.*) For the third category, "the idea that .xyz is 'popular' or 'successful' is far too vague to indicate that respondents had formed any false belief based on the post [because] general descriptors such as "popular" or "successful" can clearly not be assumed to indicate a belief about a number of purchases". (*Id.*) And the fourth category is a literally truthful message with no indication of any misleading component. (*Id.*)

None of the Test Group respondents answered that the Blog Post indicated anything about *purchases*. All of Mazis's answer categories relating to the number of domain names indicate that respondents mentioned a number of *registrations* or *registrants*. (Mazis Report, p. 13.) Mazis did not code any respondents as having answered that .xyz has the most *purchased* domain names, that 447,544 domains have been *purchased*, or any similar message. (*Id.*)

Poret's review of all of the open-ended messages confirms a lack of deception[4]:

> "Out of 303 respondents and 606 total answers to the main messages and other messages question, there are zero answers indicating that .xyz has sold 447,544 (or any specific number of) domain names or that 447,544 (or any specific number of) domain names have been purchased. All of the answers referring to the 447,544 figure accurately refer to registrations or registrants."

(Poret Report, p. 13.) These results indicate that "at least[5] 99% of consumers were not misled by the post into thinking that the domain name registrations are equivalent to domain name purchases." (*Id.*) In other words, "the Mazis survey only confirms that the actual post does not

---

[4] Poret notes that two answers potentially suggest a belief that the blog referred to the number of domain names sold. One respondent (138004291) answered that .xyz was "outselling" other companies. A second respondent (138006564) answered that .xyz is "available and selling fast". But this second respondent also stated—as part of the same answer—that "frankly I am too tired to make much sense out of it" and answered in the next question "I dont know. too tired to retain much," which undermines the validity of this interview as a meaningful review and consideration of the blog post. (Poret Report ¶ 13.) Even if these two respondents were counted as "misled," they are only 0.7% of the Test Group. (*Id.*) 99.3% of the Test Group did not mention sales.
[5] *See* supra note 4.

5

communicate that most of the domain names were given away for free and that only about 70,000 were purchased, whereas [the] control version of the blog does." (*Id.*, p. 14.)

Next, Mazis's respondents were shown a single statement from the version of the Blog Post they had been shown. Test Group participants saw text from the real Blog Post: ".xyz has received the most registrations of all new gTLDs with 447,544 domains registered." (Mazis Report ¶ 25.) Control Group participants saw the statement that Mazis created: "We have actually sold approximately 70,000 domain names with .xyz extensions!" (*Id.*) Respondents were then asked two questions about the statement they had been shown.

First, respondents were asked "What does this section of the blog post communicate to you?" (Mazis Report ¶ 25.) As in the first group of questions, all of the categories of answers for respondents in the Test Group that relate to the number of domains pertain to registrants (*i.e.* not purchasers). (*Id.*, p. 15.) Mazis did not code any respondents as having answered that <.xyz> has the most *purchased* domain names, that 447,544 domains have been *purchased*, or any similar message. (*Id.*)

Out of the 303 Test Group respondents, only a single one gave any indication that the blog communicated something about the number of domains sold.[6] (Poret Report, p. 15.) Even when considered along with the earlier questions, "less than 1% of respondents gave any answer that possibly refers to the sale or purchase of domain names, as opposed to the registration of domain names." (*Id.*, pp. 15–16.) According to Poret, "the fact that there were 900 verbatim

---

[6] Poret notes that that respondent's answer to the earlier question about the blog post's "main message" raises serious doubt as to whether the respondent was genuinely interested in a blog post about domain names or gave meaningful consideration to it: "Some event was over two months ago. And then a lot of boring tech jargon."

6

responses to these open-ended questions and *almost none* of them indicate that the actual blog post communicated anything about the number of domain names purchased is strong evidence that the blog post was not deceptive." (*Id.*, p. 16.)

      Second, respondents were asked the following closed-ended question: "Does or doesn't this section of the blog post communicate something about the number of .xyz domain names that have been purchased?" (Mazis Report ¶ 26.) This is the only place in the Mazis survey where any Test Group respondents gave an answer relating to the number of domain names "purchased." (Poret Report, p. 16.)

      This question violates two well-accepted principles of survey research. First, the question violates the well-accepted principle that survey questions are "not leading." (*Id.*, p. 17 (citing Manual For Complex Litigation, Third § 21.493, at 102 (1995).) This question is leading because "it explicitly suggests the possibility that the blog communicates something about the number of domain names 'purchased' and merely requires that the respondent answer affirmatively to be deemed misled." (Poret Report, p. 17.)

      Second, Mazis failed to use any control to account for the tendency of the question to induce respondents to answer affirmatively (*i.e.* that the blog post did communicate something about the number of domain names purchased) even if the blog was not misleading. (Poret Report, p. 19.) Without the use of a control, there is no way to know whether the results are caused by the suggestive nature of the question as opposed to genuine respondent perception of the blog post. (*Id.*) Poret explains that without a control for this question the results are "arbitrary and of no value." (*Id.*)

7

Based on the survey, Mazis opines that the blog post is misleading "because it fails to inform readers about the number of .xyz domains that were actually purchased." (Mazis Report ¶ 8.) Mazis's survey reaches one conclusion: consumers did not think about whether domain names were purchased when they read the Blog Post. (Mazis Report, ¶¶ 9–11, 38.) Mazis admits that he could have constructed surveys that measured actual consumer confusion related to the availability of domain names and other key issues. (Mazis Dep. Tr. 24:7–25:18.) But he was not asked to do so. *Id.*

### III. Argument

Verisign bears the burden of establishing that Mazis's proffered testimony is admissible under Federal Rule of Evidence 702. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 592 n. 10.) Rule 702 allows for opinion testimony by an expert only if the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue and:

1) the testimony is based upon sufficient facts or data;
2) the testimony is the product of reliable principles and methods; and
3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Because expert witnesses have the potential to "be both powerful and quite misleading," the Court must ensure that any and all scientific testimony is both relevant and reliable. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) and *Daubert*, 509 U.S. at 595.)

8

The Court determines whether expert testimony is admissible. Fed. R. Evid. 104(a). The Court serves as a gatekeeper for all types of scientific testimony, and must exclude testimony that is irrelevant, unreliable, or more likely to mislead than to help the jury understand a contested issue of material fact. *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001), citing *Daubert*, 509 U.S. 579, and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

**A.     The Mazis report is not relevant because it will not help the jury to understand what is already obvious—that the blog post does not inform readers about the number of <.xyz> domain names that were purchased or that were given.**

Helpfulness to the jury is the touchstone of admissibility for expert opinion. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). The relevance predicate requires that the scientific testimony must properly "fit" the facts of the case, meaning that the Court must decide whether Verisign's proposed testimony is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *PBM Products, LLC v. Mead Johnson Nutrition Co.*, No. 3:09-CV-269, 2010 WL 56072, at *1–2 (E.D. Va. Jan. 4, 2010) aff'd sub nom. *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111 (4th Cir. 2011).

Rule 403 further provides that the court must ensure that the probative value of any proffered evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The Court must ensure that the probative value of proffered expert testimony is not "'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 636 (E.D.N.C. 2013) (citing another district court case, quoting Fed. R. Evid. 403).

9

Thus, expert opinion that merely recites facts the jury could observe is not helpful and therefore not admissible. *Kopf*, 993 F.2d at 377. And expert opinion that might supplant a jury's independent exercise of common sense is especially harmful. *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986)); *Persinger v. Norfolk & Western Railway Co.*, 920 F.2d 1185, 1188 (4th Cir. 1990) (testimony about how difficult it is to lift heavy things, even couched in scientific terms, is not helpful and is thus excludable). For example, in *Scott*, a concrete expert testified that concrete degradation in a curb meant that the plaintiff could not have seen an obstruction. The court held that the expert opinion was not helpful because the facts relayed were obvious to jurors, yet not harmless because concrete degradation could not provide a basis for the plaintiff's tort claim and the jury might have been misled.

Here, as in *Scott*, any lay person reading XYZ's Blog Post would understand that it made no claims about the number of paid registrations. (*See* Poret Report, p. 3). Mazis's report is not helpful to the jury because it merely repeats that common-sense observation. XYZ concedes that the blog post communicates nothing about purchases.

Mazis's testimony would be confusing and harmful, like in *Scott*, because the jury might conclude that they could find for Verisign based on the mere fact that XYZ's report about registrations did not discuss purchases. This jury conclusion would ignore Verisign's burden to prove, for example, that the statement "tends to deceive or mislead a substantial portion of its intended audience." *See Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 280 (4th Cir. 2002). The jury may be misled to believe that because the expert points out the obvious, the obvious must lead to a liability finding.

10

**B.    The Mazis report is not relevant because it does not address the actual issue relating to the statement—whether it is a false or misleading representation.**

The Mazis survey is irrelevant because it does not demonstrate that the blog post is false or misleading. Expert testimony "which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. There must be a "valid ... connection between the expert's testimony and the pertinent inquiry before the court as a precondition to admissibility." *Garlinger v. Hardee's Food Sys., Inc.*, 16 F. App'x 232, 235 (4th Cir. 2001); *see also Petri v. Virginia Bd. of Med.*, No. 1:13-CV-01486, 2014 WL 5421238, at *2 (E.D. Va. Oct. 23, 2014), citing *Garlinger*, 16 F. App'x at 235 (excluding expert testimony that did not relate to the ultimate question before the jury, even though it might have been helpful to understand the background of the dispute.)

A statement can be false either literally or impliedly. *Scotts*, 315 F.3d at 272–73. Verisign does not claim that the blog-post statement about the number of registrations is literally false. Nor could it do so, because the statement was literally true at the time it was made. If a statement is not literally false, then the "plaintiff must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers". *Id.* at 272–73. (internal citations and quotations omitted). A court "may find that a statement is impliedly misleading only if presented with evidence of actual consumer deception." *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 14 (7th Cir. 1992)).

The purpose of consumer surveys in false-advertising cases is to determine the message actually conveyed to consumers. *Scotts*, 315 F.3d at 280. The survey must "account for the actual allegations in the case [in order to] provide the required evidence of [implied] falsity." *PBM Products*, 639 F.3d at 122.

11

The Mazis survey does not determine the message actually conveyed to consumers. The message actually conveyed says nothing about purchases, and only reports registrations. When consumers were asked what the survey communicated, respondents said nothing about purchases—only about registrations. The Mazis Report does not indicate actual consumer deception. Instead, it merely provides obvious information that XYZ's blog did not inform consumers how many of the domain names were purchased. (*See* Poret Report, p. 1.)

Additionally, the Mazis survey demonstrates that the blog post only communicates messages about the number of registrations—not the number of registrations which were purchased. When asked to identify messages conveyed by the blog post, only 21% of the responses referenced the number of domain names at all. (Mazis Report ¶ 32.) Mazis coded all of those answers as relating to *registrations* or *registrants*. (*See* Mazis Report, p. 13.) Mazis did not code any responses as identifying the blog post's message as communicating the number of *purchases* or *purchasers* (or similar) of .xyz domain names. (Mazis Report, p. 13.) Because the Mazis survey does not "account for the actual allegations in the case" it cannot "provide the required evidence of falsity." *PBM Products*, 639 F.3d at 122. Mazis's opinion is not relevant and is therefore inadmissible.

C. **Mazis's opinions about materiality are speculative, unsupported, and outside of his expertise.**

Materiality, or whether the statements were "likely to influence the purchasing decision," is an element of a Lanham Act violation. *Scotts*, 315 F.3d at 272 (quotations omitted). At least some probative evidence of materiality is required and, generally consumer surveys offer the best evidence of materiality. *JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.*, 28 F. App'x

207, 214–15 (4th Cir. 2002) (upholding finding of materiality because it was supported by probative evidence, including a consumer survey).

Although Mazis admits he could have, Mazis's survey did not ask consumers about the materiality of the Blog Post statement. The survey failed to ask the key question: whether that information would have influenced a domain-name purchasing decision. (Poret Report, pp. 28–29.) The Supplemental Mazis Report admits this flaw: "it is not possible to determine how this information [whether domains were purchased] would have impacted respondents' purchase decisions from the questions contained in my survey." (Supplemental Mazis Report, ¶ 16.)

"An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger ConstCo. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 637 (E.D.N.C. 2013) ("Speculative opinions not supported by the record should be excluded.") In *SMD Software*, the court excluded a survey that improperly assumed that every customer that read an allegedly false comparison chart would have made a purchasing decision based solely on the chart. 945 F. Supp. 2d 628, 636 (E.D.N.C. 2013); *see also Lanphere Enterprises, Inc. v. Jiffy Lube Int'l Inc.*, 138 F. App'x 20, 23 (9th Cir. 2005)(survey that failed to ask whether customers would have switched oil-change providers but for the allegedly false advertisements excluded).

This Court should exclude the Mazis survey for the same reason that the *SMD Software* court did. Mazis assumes materiality without measuring it. Ultimately, Mazis relies on his personal belief for the opinion that consumers expect domain names are purchased, not received for free. (*See* Supplemental Mazis Report ¶¶ 3–5.) But Mazis is not an expert in domain-name consumer behavior and his personal opinion on this issue is inadmissible. *See Thomas J. Kline,*

*Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) (district court abused its discretion in admitting "expert" testimony on whether defendant's shift in credit practices was unjustified credit and price discrimination under the Robinson–Patman Act by a witness whose only qualifications were an MBA and who had no experience in making credit decisions).

## IV.     Conclusion

Verisign's survey expert tested an issue that is not relevant to this case, not in dispute, and that is obvious to any juror. XYZ concedes that the Blog Post informs readers about the number of <.xyz> domain names registered and not purchased. The expert's opinion as to the materiality of that statement is also inadmissible because he failed to ask survey questions pertaining to materiality. Mazis's testimony does not satisfy the standard for expert opinions and is inadmissible. The Court should exclude Mazis from testifying in this case.


Dated August 28, 2015                          /s/ Timothy J. Battle
                                               Timothy J. Battle
                                               Timothy J. Battle Law Offices
                                               VSB# 18538
                                               524 King Street
                                               Alexandria, VA 22320-4593
                                               (703) 836-1216 Tel
                                               (703) 549-3335 Fax
                                               *tjbattle@verizon.net*

                                               Derek A. Newman, admitted pro hac vice
                                               Derek Linke, admitted pro hac vice
                                               Jason Sykes, admitted pro hac vice
                                               Sophy Tabandeh, admitted pro hac vice

                                               *Counsel for Defendants XYZ.com, LLC
                                               and Daniel Negari*

**CERTIFICATE OF SERVICE**

I certify that on August 28, 2015, I electrically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

    Nicholas Martin DePalma
    Randall Karl Miller
    Kevin William Weigand
    Taylor Sumner Chapman
    Venable LLP (Vienna)
    8010 Towers Crescent Drive
    Suite 300
    Tysons Corner, VA 22182
    nicholas.depalma@venable.com
    rkmiller@venable.com
    kwweigand@venable.com
    tschapman@venable.com

    /s/ Timothy J. Battle
    Timothy J. Battle (VSB No. 18538)
    Timothy J. Battle Law Offices
    524 King Street
    Alexandria, VA 22320-4593
    (703) 836-1216 Tel
    (703) 549-3335 Fax
    tjbattle@verizon.net
    *Counsel for XYZ.com and Daniel Negari*