**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

Verisign, Inc.,

Plaintiff,

v.

XYZ.com, LLC et al.,

Defendants.

Civil Action No. 1:14-cv-01749 CMH-MSN

**DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF LAUREN KINDLER AND MEMORANDUM IN SUPPORT**

## Table of Contents


I. Introduction ... 1

II. Factual Background ... 2

A. Verisign's Complaint alleges false advertising by a new competitor, XYZ. ... 2

B. Verisign hired an economic and damages expert to "evaluate the damages that should be paid by XYZ due to its alleged wrongful conduct". ... 3

1. The Kindler Report's evaluation of allegedly lost Verisign business is based on irrelevant data about .net registrations. ... 4

2. Kindler erroneously assigns all .xyz revenue to XYZ's advertising campaign and ignores all other factors. ... 7

3. Kindler provides no information about Verisign's advertising expenses other than to report what Verisign told her about them. ... 8

III. Argument ... 9

1. Kindler's expectation damages estimates are unreliable because she fails to account for alternative explanations. ... 10

2. Kindler's expectation-damages estimates are unreliable because she simply assumes that the alleged misconduct caused all of Verisign's claimed lost <.net> registrations without any basis for that conclusion. ... 12

3. Kindler's disgorgement analysis is unreliable because it is based on speculation and parroting information XYZ produced without meaningful analysis. ... 13

B. Kindler provides no expertise regarding corrective advertising. ... 14

IV. Conclusion ... 15

## I. Introduction

Verisign alleges that Defendants made statements that "reflect a strategy to create a deceptive message to the public that companies and individuals cannot get the **.COM** domain names they want from Verisign, and that XYZ is quickly becoming the preferred alternative." Verisign hired a damages expert, Lauren Kindler, to evaluate the damages for which it claims XYZ is responsible as a result of alleged false advertising.

Kindler's testimony is not reliable. Kindler focuses on Verisign's claimed loss of <**.net**> registrations when the Complaint alleges false advertising about Verisign's <.com> business, an entirely different product. Kindler failed to evaluate key factors required by industry standards, including (1) Verisign's revenue trends; (2) marketplace changes, specifically the addition of new gTLDs; (3) changes in Verisign's advertising and promotion; (4) XYZ's advertising that is not allegedly false; or (5) the decline in <.net> registrations due to other competitors.

Kindler also failed to consider numerous other alternative explanations for Verisign's claimed loss of <.net> registrations. Instead, Kindler merely assumes that all of Verisign's <.net> registrations are attributable to the alleged false advertising. Similarly, Kindler's disgorgement analysis merely assumes that all of XYZ's revenue is attributable to the alleged false advertising.

Lastly, Kindler's testimony about corrective advertising is not even relevant. Kindler is not an expert in corrective advertising or advertising in general. Her report merely relays information provided by Verisign and states it as her opinion. Because she is not an expert, her opinion on this subject is not relevant and inadmissible. Verisign can present this testimony through its own fact witnesses.

Kindler's proposed expert testimony should be excluded.

## II. Factual Background

### A. Verisign's Complaint alleges false advertising by a new competitor, XYZ.

Verisign and XYZ operate competing domain-name registries. (Complaint (ECF 1).) Verisign sells the <.com>, <.net>, and <.org> domain-name products. XYZ sells the <.xyz> domain-name product. Each of these domain names competes against each other. They are referred to as TLDs (top-level domains). In 2014, about 700 new TLDs launched in the marketplace. <.xyz> was one of the almost 700 new TLDs.

Verisign alleges that "XYZ has launched a promotional campaign that is designed to suggest that it is superior to Verisign." (*Id.* at ¶ 16.) Verisign's Complaint identifies several statements that it claims "deceptively inflate the success and desirability of .XYZ as a .COM competitor." (*Id.* ¶ 52.) Verisign's lawsuit against XYZ and Negari alleges false advertising under the federal Lanham Act, 15 U.S.C. § 1125(a)(1)(B). (*Id.*)

Verisign's Complaint identifies several allegedly false statements about its <.com> domain-name business. Verisign alleges the statements "when viewed together and in context, reflect a strategy to create a deceptive message to the public that companies and individuals cannot get the .COM domain names they want from Verisign, and that XYZ is quickly becoming the preferred alternative." (*Id.* at ¶ 42.)

Verisign claims that it was "injured as a result of XYZ and Negari's false and/or misleading statements of fact". (*Id.* ¶ 75.) Verisign claims that Defendants "have been unjustly enriched at the expense of Verisign as a consequence of [their] false advertising." (*Id.* ¶ 77.) Verisign claims lost profits, disgorgement, and corrective advertising damages. (*See id.* ¶¶ 4, 74–75.)

**B. Verisign hired an economic and damages expert to "evaluate the damages that should be paid by XYZ due to its alleged wrongful conduct".**

Verisign retained Lauren R. Kindler[1] to evaluate the damages for which it claims XYZ is responsible as a result of alleged false advertising, including "disgorgement damages, damages from economic harm to Verisign, and/or corrective advertising damages." (Kindler Report ¶ 9.) Lauren Kindler has a degree in economics and no experience in the domain-name industry. (Kindler Report ¶¶ 3-6.)

XYZ retained Thies Lindenthal, Ph.D., Samuel Hewitt, CPA, and Jothan Frakes to evaluate Ms. Kindler's report.[2] Dr. Lindenthal is a professor of economics with substantial experience in the domain-name industry. (Lindenthal Report ¶¶ 1-2.) He also conducted research and published an article on the effects of large numbers of domain name registrations on market demand. (Lindenthal Report ¶ 40.)

Hewitt is a CPA and principal of the financial advisory consulting firm of GlassRatner Advisory & Capital Group LLC. (Hewitt Report ¶ 1.) Hewitt has approximately 32 years of experience in forensic and general accounting, including the quantification of complex economic damages. (Hewitt Report ¶ 7.) He performed his analysis using the professional standards required by the American Institute of Certified Public Accountants for the provision of litigation services. (Hewitt Report ¶ 2.)

---

[1] *See* July 3, 2015 Expert Report of Lauren R. Kindler ("Kindler Report") (Declaration of Derek Linke in Support of Defendants' Motion to Exclude Plaintiff's Experts ("Linke Decl."), Ex. A); August 12, 2015 Rebuttal Expert Report of Lauren R. Kindler (Supplemental Kindler Report") (Linke Decl., Ex. B).

[2] *See* July 31, 2015 Rebuttal Expert Report of Thies Lindenthal, Ph.D. ("Lindenthal Report") (Linke Decl., Ex. L); August 1, 2015 Expert Report of Samuel J. Hewitt, CPA ("Hewitt Report") (Linke Decl., Ex. J); August 1, 2015 Rebuttal Expert Report of Jothan Frakes ("Frakes Report") (Linke Decl., Ex. K).

Frakes is an industry expert who has been active in the domain name industry for over 20 years. He developed, managed and launched internet registrars, developed registry systems for TLDs similar to the <.com> and <.xyz> businesses, and co-founded and co-produced the industry-leading international commercial conferences for domain names. Recently, Frakes was retained as a subject-matter lead for technical and financial questions submitted by the international organization that approves TLD operators like Verisign and XYZ. (Frakes Report ¶¶ 9-14.)

**1. The Kindler Report's evaluation of allegedly lost Verisign business is based on irrelevant data about .net registrations.**

Kindler focuses on <.net> registrations. In the Kindler Report, [redacted]. (*See* Kindler Report, ¶ 50.) The reason for this is simple: [redacted]. (Hewitt Report ¶ 49; Frakes Report, ¶ 56.)

Kindler is not an expert on the domain-name industry and fails to identify any data supporting her conclusion [redacted] (Kindler Dep. Tr. 201:4-6; Supplemental Kindler Report ¶ 25.) Verisign itself undercuts Kindler's unsupported theory that <.net> registrations were affected. In public statements, Verisign's leadership described the decline in <.net> registrations as due to "headwinds" from the release of new TLDs generally, not XYZ's statements. (Frakes Report ¶ 59.)

Lost-profits analyses like Kindler's should be performed according to industry standards. (Hewitt Report ¶ 54.) Those standards required Kindler to evaluate:

- Verisign's revenue trends;
- Marketplace changes, specifically the addition of new TLDs;
- Changes in Verisign's advertising and promotion;
- XYZ's advertising that is not allegedly false; and
- Decline in .net registrations due to other competitors.

(Hewitt Report ¶ 54.) Kindler did not address any of these factors. Instead, [redacted]

Kindler ignores several key factors that might have resulted in reduced <.net> registrations unrelated to XYZ's advertising. On January 12, 2012, ICANN, the organization that governs the Internet, opened the window to competition with <.net> by allowing new TLDs. (Hewitt Report ¶ 16.) By July 2015, 698 new competitors with <.net> had entered the field. *Id.* Kindler does not evaluate the impact of competition on demand for <.net> names. (Hewitt Report ¶¶ 60-61.) And Verisign itself admits that the introduction of new competition—the new TLDs—could "have a material adverse effect on our business, results of operations, financial

condition, and cash flows." (Hewitt Report ¶ 60, citing Verisign, Inc. SEC Form 10-K for the period ending December 31, 2013 at 44.)

Kindler's analysis further:

1. [redacted] Hewitt Report ¶¶ 9(a)(ii); 29). Tellingly, Kindler admits that [redacted] (Kindler Dep. Tr. at 142:8-143:3.)
2. Fails to consider the effect of XYZ's other advertising, promotions, and branding. Kindler admits that [redacted]
3. [redacted]
4. [redacted]
5. Fails to account for the overall downward trend of <.net> registrations. (Lindenthal Report ¶¶ 20-24; Hewitt Report ¶ 56-59; Frakes Report at ¶ 52.) Although Kindler [redacted]
6. [redacted]
7. [redacted]



[redacted]

8. [redacted]

9. [redacted]

**2. Kindler erroneously assigns** [redacted]

[redacted]

• [redacted]

[redacted]

[redacted]

(Hewitt Report ¶ 9(a).

Kindler also [redacted]

[redacted] (Lindenthal Report ¶ 35.) [redacted] Hewitt Report ¶¶ 38-39.)

The Kindler Report also relies on assumptions without any factual basis. Kindler reports as fact that [redacted] (Kindler Report ¶ 31.) But the only available science on the issue suggests just the opposite: TLDs that have given away large numbers of domain names have generally not seen corresponding increases in domain name sales. (Lindenthal Report ¶ 37.) And the Kindler Report also assumes that [redacted]. Instead, comparative data from <.info>'s giveaway program demonstrate that there was no corresponding loss of <.com> or <.net> registrations during the same period. (Lindenthal Report ¶¶ 38-40.)

**3. Kindler provides no information about Verisign's advertising expenses other than to report what Verisign told her about them.**

Kindler reports that she was told by Verisign that [redacted]. (Kindler Report ¶¶ 54-56.) [redacted] *Id.*

Although Verisign now claims that [redacted] Hewitt Report ¶ 75.)

Despite access to Verisign's financial data, Kindler also fails to evaluate the effects of

## III. Argument

Plaintiff bears the burden of establishing that Kindler's proffered testimony is admissible under Federal Rule of Evidence 702. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 592 n. 10.) Rule 702 allows for opinion testimony by an expert only if the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue and:

1) the testimony is based upon sufficient facts or data;
2) the testimony is the product of reliable principles and methods; and
3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Because expert witnesses have the potential to "be both powerful and quite misleading," the Court must ensure that any and all scientific testimony is both relevant and reliable. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) and *Daubert*, 509 U.S. at 595.)

The Court determines whether expert testimony is admissible. Fed. R. Evid. 104(a). The Court serves as a gatekeeper for all types of scientific testimony, and must exclude testimony that is irrelevant, unreliable, or more likely to mislead than to help the jury understand a contested

issue of material fact. *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001), citing *Daubert*, 509 U.S. 579, and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Several factors assist in guiding the Court's assessment of whether the reasoning or methodology underlying testimony is scientifically valid and "whether that reasoning or methodology properly can be applied to the facts in issue." *Cooper*, 259 F.3d at 199, (quoting *Daubert*, 509 U.S. at 592–93). These factors include: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys great general acceptance within a relevant scientific community." *Id.* (citing *Daubert*, 509 U.S. at 592–94). The court has broad latitude to consider these or whatever factors bear on relevance or reliability. *Westberry*, 178 F.3d at 261.

**1. Kindler's expectation damages estimates are unreliable because she fails to account for alternative explanations.**

Expectation damages are the amount of profit Verisign would have received absent XYZ's allegedly misleading advertising. *See BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1092 (7th Cir. 1994). In order to receive expectation damages, Verisign must prove that it actually lost sales as a direct result of XYZ's actions. *Pharmanetics, Inc. v. Aventis Pharm., Inc.*, No. 5:03-CV-817-FL(2), 2005 WL 6000369, at *12 (E.D.N.C. May 4, 2005) aff'd, 182 F. App'x 267 (4th Cir. 2006) *Id.* Estimates as to the amount of damages, including estimates of lost profits "must be made with reasonable certainty." *Id.* This is particularly true, in a situation such as this, when an expert's estimate of damages "consists of an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." *Id.*

Courts may also consider whether an expert has adequately accounted for obvious alternative explanations in determining whether or not that expert is reliable. *SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 641 (E.D.N.C. 2013) (citing Fed. R. Evid. 702 advisory committee's note (2000 amendment)); *see also Pharmanetics*, 182 Fed.Appx. at 270–73 (proposed expert was properly excluded where he assumed appellee's actions caused all of appellant's losses instead of causes reasonably inferred from the record).

In *Pharmanetics*, the court excluded an expert report that assigned all lost sales to plaintiff's actions without any evaluation of other potential causes. *Pharmanetics, Inc. v. Aventis Pharm., Inc.*, No. 5:03-CV-817-FL(2), 2005 WL 6000369. The *Pharmanetics* court noted that the damages model incorrectly assumed that defendant's actions were the cause of all of plaintiff's lost sales. *See also Cooper*, 259 F.3d at 202 ( "[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony"); *Target Mkt. Publ. v. ADVO, Inc.*, 136 F.3d 1139, 1145 (7th Cir.1998) (rejecting expert report that calculated lost profits on the basis of an early plan that "sought to demonstrate what [plaintiff's] profits might be given certain assumptions that had not yet, and might never, come to pass."); *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1040 (8th Cir. 1999)(excluding damages report because it failed to account for all possible factors leading to a decline in sales.); *Turfgrass Grp., Inc. v. Carolina Fresh Farms, Inc.*, No. 5:10-CV-00849-JMC, 2013 WL 1010383, at *3 (D.S.C. Mar. 14, 2013) aff'd, 588 F. App'x 992 (Fed. Cir. 2014)(failure to consider relevant factors and addition of invented factor without any peer review made damages report unreliable.).

Kindler's report is unreliable because she ignores other likely factors, including failing to consider [redacted] , XYZ's other advertising, and other market forces driving domain-name selection. (Hewitt Report ¶¶ 9(a)(ii), 29-34.) Kindler's report is the same as in *Pharmanetics* and similar cases where courts excluded experts because she assigned all lost sales to Defendants' actions without any evaluation of other potential causes. For the same reason that courts evaluating similar expert reports excluded them, this Court should exclude Kindler.

**2. Kindler's expectation-damages estimates are unreliable because she simply assumes that the alleged misconduct caused all of Verisign's claimed lost <.net> registrations without any basis for that conclusion.**

Similarly, expert opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record. *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir.1994). For example, in *Tyger*, an expert calculated construction delays based on an assumption that sand was not available. Because there was no evidence this assumption was true, the 4th Circuit excluded the expert's report.

Kindler assumes that [redacted] (Hewitt Report ¶ 51.) [redacted] rakes Report ¶ 59.) In her supplemental report, Kindler claims that [redacted] (Supplemental Kindler Report at ¶ 25(a).) [redacted]



[redacted] (Kindler Dep. Tr. 207:2-6.) That statement is not false; it is a statement of opinion.

[redacted] (Kindler Dep.Tr. 142:20-143:3.) [redacted] (Kindler Dep. Tr. 146:6-147:8.) Like *Cooper, Pharmanetics*, *Tyger, Target Mkt., Blue Dane*, and *Turfgrass,* there is no basis for the key assumption underlying Kindler's report, and the entire report is therefore unreliable and should be excluded.

Even if Kindler could reliably point to lost <.net> registrations as evidence of damage, Kindler's calculation of the number of lost registrations is not supported by data. In order to artificially create the impression that <.net> registrations declined after XYZ's statements, [redacted] (Lindenthal Report ¶¶ 20-28; Hewitt Report ¶¶ 56-59; Frakes Report ¶ 52.) The Kindler Report is also riddled with math errors, making her calculations unreliable. (Hewitt Report ¶ 65(a); Kindler Dep. Tr. 250:14-251:11.)

**3. Kindler's disgorgement analysis is unreliable because it is based on speculation and parroting information XYZ produced without meaningful analysis.**

To obtain XYZ's profits, Verisign must prove the amount of XYZ's revenue stemming from the false advertising. 15 U.S.C. § 1117(a); *Nat'l Products, Inc. v. Gamber-Johnson LLC*, 734 F. Supp. 2d 1160, 1166 (W.D. Wash. 2010) aff'd, 449 F. App'x 638 (9th Cir. 2011). The burden then shifts to XYZ to prove costs and expenses related to that revenue. *Id.* Kindler misunderstands the legal standard and includes revenue from every <.xyz> domain name

registration without any evidence that any were sold because of the alleged false statements. This ignores the myriad other factors that might have influenced consumer decisions to purchase <.xyz> domain names. (Hewitt Report ¶¶ 9(b), 36, 38-40, 45; Lindenthal Report ¶¶ 35-36.)

Even if Kindler had correctly relied on all <.xyz> domain name registrations, she did not evaluate any actual data and offers no expertise regarding the calculation of XYZ's gross revenue, but instead only parrots Verisign's representations. (Kindler Report ¶ 11, n. 9.) Kindler also attempts to evaluate XYZ's costs and expenses, but admits that she relies on incomplete data. (Kindler Dep. Tr.122:12-15, 174:15-177:12, 181:11-183:17.) Hewitt Report ¶ 45.) Kindler's supplemental report does not fix this problem. (Kindler Supplemental Report ¶¶ 15-22.) Kindler's conclusions are accordingly inadmissible because they are irrelevant and unreliable, and separately because they would confuse the jury by presenting incomplete and mistaken cost data when the actual data is available.

**B. Kindler provides no expertise regarding corrective advertising.**

Kindler is not an advertising expert and does not provide any analysis of whether Verisign's alleged corrective advertising was necessary or effective indler Report ¶¶ 54-56; Kindler Dep. Tr. 249:1-21.) Because the jury is not assisted by Kindler's relay of information Verisign could directly introduce into evidence, Kindler's opinion is not admissible. *Kopf*, 993 F.2d at 377 (expert testimony that does not rely on specialized knowledge inadmissible.)

Further, Kindler fails to conduct any analysis of the allegedly corrective advertising. (Hewitt Report ¶¶ 74-78.) [redacted] To the extent Verisign wishes to argue otherwise, it is free to present a witness from inside the company to testify about the advertising purpose and whether it was successful. Verisign does not need Kindler for that. Indeed, her testimony is based entirely on what Verisign told her, and not on an independent analysis.

## IV. Conclusion

Kindler's testimony does not satisfy the standard for expert opinions and is inadmissible. She relies on unfounded speculation that Verisign itself provided. She did not conduct any independent analysis. Kindler simply assumed that *all* XYZ's sales were due to false advertising, and then leaped to the conclusion that those sales caused <.net> to decline. When a damages expert fails to account for alternative explanations for the claimed losses, the court should exclude the expert. When lost-profit calculations are based on speculative assumptions, the expert should be excluded. Finally, Kindler, is not an expert in corrective advertising, and so her opinion as to whether Verisign's alleged corrective advertising was necessary or effective is irrelevant. XYZ respectfully requests the Court exclude Kindler for those reasons.

Dated August 28, 2015

/s/ Timothy J. Battle
Timothy J. Battle
Timothy J. Battle Law Offices

VSB# 18538
524 King Street
Alexandria, VA 22320-4593
(703) 836-1216 Tel
(703) 549-3335 Fax
*tjbattle@verizon.net*

Derek A. Newman, admitted pro hac vice
Derek Linke, admitted pro hac vice
Jason Sykes, admitted pro hac vice
Sophy Tabandeh, admitted pro hac vice
100 Wilshire Boulevard, Suite 940
Santa Monica, CA 90401
(310) 359-8200 Tel
(310) 359-8190 Fax
*dn@newmanlaw.com*
*linke@newmanlaw.com*
*jason@newmanlaw.com*
*sophy@newmanlaw.com*

*Counsel for Defendants XYZ.com, LLC and Daniel Negari*

**CERTIFICATE OF SERVICE**

I certify that on August 28, 2015, I electrically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Nicholas Martin DePalma
Randall Karl Miller
Kevin William Weigand
Taylor Sumner Chapman
Venable LLP (Vienna)
8010 Towers Crescent Drive
Suite 300
Tysons Corner, VA 22182
nicholas.depalma@venable.com
rkmiller@venable.com
kwweigand@venable.com
tschapman@venable.com

/s/ Timothy J. Battle
Timothy J. Battle (VSB No. 18538)
Timothy J. Battle Law Offices
524 King Street
Alexandria, VA 22320-4593
(703) 836-1216 Tel
(703) 549-3335 Fax
tjbattle@verizon.net
*Counsel for XYZ.com and Daniel Negari*