IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| Verisign, Inc., <br><br> Plaintiff, <br><br> v. <br><br> XYZ.com, LLC and Daniel Negari, <br><br> Defendants. | Case No. 1:14-cv-01749 CMH-MSN |

**DECLARATION OF DANIEL NEGARI IN SUPPORT OF DEFENDANTS' RESPONSE TO VERISIGN, INC.'S CONSENT MOTION TO SEAL DOCKET NO. 219-1 AND INCORPORATED MEMORANDUM IN SUPPORT**

I, Daniel Negari, hereby declare:

1. I am the CEO of XYZ.com, LLC and an individual defendant in this matter. I am competent to testify and testify from personal knowledge.

2. In response to Verisign, Inc.'s discovery requests, XYZ produced documents related to its confidential business deals, including emails between XYZ and domain name registrars and others. XYZ designated the materials that included highly-sensitive and confidential information as "confidential" and/or "attorney's eyes only" under the Protective Order

3. Verisign's list of exhibits (Dkt. 219-1) includes descriptions of documents that XYZ has designated as either "confidential" or "attorney's eyes only". For example, Verisign's entries relating to email threads produced by XYZ include the sender, recipient, and a description of the subject matter of the communication which includes confidential information about XYZ's business relationships and agreements with third parties.

4. Exhibit A is a true and correct copy of the August 20, 2015 *Domain Name Wire* article entitled "Here are the Exhibit and Witness lists for the Verisign v. XYZ trial".

5. Exhibit B is a true and correct copy of the August 25, 2015 *DomainIncite* article

entitled "Did XYZ.com pay NetSol $3m to bloat .xyz?".

6. The domain-name industry depends on confidentiality. Participants do not want business deals disclosed because pricing and exclusivity arrangements, if known, can give competitors a business advantage.

7. Most of XYZ's deals with registrars are protected by confidentiality clauses, and even the existence of a deal—as revealed by Verisign's exhibit list—can be harmful to both XYZ and XYZ's business partners if publicly known.

8. Numerous industry professionals contacted XYZ in the days immediately following Verisign's release of confidential information. In one exchange, an industry professional who works with both XYZ and Verisign was so upset that Verisign might know what he had been discussing with XYZ that he sent eight messages in a one-hour period demanding that XYZ give him all the emails provided to Verisign so he could evaluate the damage done, ending with "just give me the f—ing emails."

9. Another CEO of a major company now refuses to communicate electronically with XYZ because he knows his emails are not private. And, in one sensitive ongoing email negotiation in a major deal, an industry professional is now holding back all communications after sending an email ending with "And whoever else is reading this, HELLO! LOL.", demonstrating that he knew his private business communications were now available to the world.

10. This widespread unhappiness caused by the public availability of Verisign's exhibit list means that registrars are less likely to work with XYZ because they know competitor Verisign has access to all their private communications—even those marked "attorney's eyes only" that should not have been disclosed

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed September 2, 2015 at Santa Monica, California.

_____
Daniel Negari