# Exhibit A

# In the Matter of:

## Verisign Inc.
### v.
## XYZ.com, LLC et al.

## Andy Simpson
## Final Transcript

July 30, 2015



**Casamo** | Court Reporting
Videography
Videoconferencing

Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

3      Q    Do you want me to explain?

4      A    I understand.

5           The way that domains work, more characters

6   means more possibilities.  It's permutative math.

7      Q    And when you're looking at the theoretical

8   number of available .com names in rendering that

9   conclusion, does it matter in your analysis whether

10  a name is super short or not?

11     A    A name does not have to be super short to

12  be available.

13     Q    You discussed in your report good domain

14  names; is that right?

15     A    I reference ways to identify names that

16  some people may see more value in, and the

17  definition I used for that is good.

18     Q    Do you think that a super-short domain

19  name by definition is good?

20     A    That's up to the person who wants to use

21  it.

22     Q    It's subjective?

1      A    Subjective?

2      Q    Well, objective means that it's a fact,

3   and subjective means that's it's a person's opinion.

4      A    Good is a subjective opinion.

5      Q    What is the public .com zone file or the

6   public com zone file?

7      A    The file that anybody can access.

8      Q    And what fields are contained in that

9   file?

10      A    It's standard by interconfiguration file.

11      Q    Are there certain fields in it --

12      A    I wouldn't say --

13      Q    -- standard fields?

14      A    -- there's fields.  There's a specific

15   format for this file.

16      Q    Can you describe the format?

17      A    Is there something specific you're looking

18   for in it?

19      Q    (Shakes head.)

20      A    Headers and configuration records.

21      Q    Who maintains a public com zone file?

22      A    Verisign maintains the public zone file.



Case 1:14-cv-01749-CMH-MSN Document 289-1 Filed 09/17/15 Page 6 of 24 PageID# 4749

1  simplicity.  It doesn't take a significant amount of

2  training to understand it.















[redacted]

16        Q    If I give you a name, could you tell me

17   whether it would pass the radio test?

18        A    I can tell you whether it would pass mine.

19        Q    Okay.  The first one is Olaxken.com.

20        A    It would pass mine.

21        Q    Why would it pass yours?

22        A    Because I can say it in a way that I think

1    that he's talked about in the past couple of years.

2    One of the things they do on a semiregular basis is

3    sit down as a bunch of people talking about domain

4    names and whether they're good or bad.

5    BY MR. NEWMAN:

6        Q    Is your definition of radio test the same

7    as the DomainSherpa definition that is described in

8    Exhibit 1037?

9        A    I would say mine is less specific than

10   his because --

11       Q    Why did you use a less specific

12   definition?

13       A    Because he was focused purely on the

14   business use of domain names in his definition.

15       Q    And yours?

16       A    As we discussed earlier, applies to either

17   businesses or individuals.

18       Q    Do you believe that DomainSherpa's

19   definition is an accepted definition?

20            MR. MILLER:  Objection.  Foundation.

21       A    I believe that it is at least one

22   definition that is -- I think if we're going to pick

1    apart the specifics of his wording, some may

2    disagree.

3    BY MR. NEWMAN:

4         Q     Are there multiple definitions of the

5    radio test?

6         A     Mine is different here.

7         Q     Do you know how many different definitions

8    exist among people who you believe are reliable?

9         A     I think it's an overly simply -- simple

10   concept.  We all may phrase it slightly differently.

11   But I think the spirit of our underlying definitions

12   is consistent.

13        Q     Does the radio test require that the user

14   hear the name?

15        A     I can envision a less pure version of the

16   test where people would be able to see it but the

17   radio implies hearing.

18        Q     But you believe the radio test can be

19   applied even if someone isn't exposed to an audible

20   version of the name?

21             MR. MILLER:  Objection.  Foundation.

22        A     You would probably call it a variant on

1   Exhibit 1038.

2        A    (Complies with request.)

3        Q    Do you recognize that?

4        A    It looks familiar but there's -- something

5   is cut off.  Oh, I see.  It's the bottom of

6   May 2015.

7        Q    Do you recognize Exhibit 1038?

8        A    I have seen this before, yes.

9        Q    What is it?

10       A    It's an article from NetNames.

11       Q    Did you cite it in your report?

12       A    I did.

13       Q    Did you consult that article when

14   formulating your definition of radio test?

15       A    I used it as a citation of others in the

16   industry using the radio test.  I did not consult

17   this definition for my own evaluation.

18       Q    Exhibit 1038 is a NetNames blog?

19       A    Yes.

20       Q    Is that a reliable source for the radio

21   test definition?

22       A    NetNames sells some host domain names.

1    They're an active player in the industry.

2        Q    Have you relied on information from

3    NetNames for a purpose other than preparing your

4    report?

5        A    I don't specifically recall.

6        Q    Is your definition of radio test different

7    than the definition provided in Exhibit 1038?

8        A    By direct wording they're different, but

9    the spirit of these is the same.   The definition

10   that I see here is that is, do your domain and

11   business names sound as they are written?

12       Q    Is that the radio test in your view?

13       A    It's a rephrasing of saying the same

14   thing.   It's a very simple test.

15       Q    So if the names don't sound as they're

16   written, they don't pass the radio test?

17       A    They might not.

18       Q    Like Olaxken.com?

19       A    It depends on who's hearing and who's

20   writing.   We established that earlier.

21       Q    Does your definition of the radio test

22   require that domain names be spelled the way they

1    sound?

2        A    I would say that -- I'm not entirely sure

3    that's relevant to my use of the radio test in this

4    context.

5        Q    So under your use of the radio test, it's

6    not important that domain names be spelled the way

7    they sound?

8            MR. MILLER:  Objection to form.

9        A    Spelled the way they sound.  I can say I

10   haven't thought of it in those terms.  The way that

11   I've used it is to say that common words are more

12   likely to pass the radio test.

13   BY MR. NEWMAN:

14       Q    Under your definition of the radio test,

15   must domain names be spelled the way they sound?

16       A    I don't believe that I'm explicit one way

17   or the other.

18       Q    So they need not necessarily be spelled

19   the way they sound, domain names, to pass the radio

20   test?

21       A    I would say it helps but it's not an

22   absolute rule.

1        Q    Does the radio test require that customers

2   be able to spell the domain name without difficulty?

3        A    Again, there are no absolute hard

4   requirements for what it takes to pass this.

5        Q    Would you please turn your attention to

6   Exhibit 1039?

7        A    (Complies with request.)

8        Q    Do you recognize it?

9        A    It's the third citation.

10       Q    Third citation to the radio test, correct?

11       A    Yes.

12       Q    Did you consult this article when

13  formulating your definition for radio test?

14       A    When we're refining the final version of

15  the report, searching for industry references, I

16  consulted this article.

17       Q    What is MJS Web Solutions?

18       A    It appears to be that they are an

19  advertising and marketing consulting group.

20       Q    Do you know that for sure?

21       A    No, I do not know that for sure.

22       Q    Do you know whether MJS Web Solutions is a

1     Q     Do you know whether you've read any

2   articles from MJS Web Solutions other than the ones

3   cited in your report?

4     A     I do not know definitively yes or no.  I

5   read a lot of these types of articles.

6     Q     Is your definition of radio test the same

7   as the one that is discussed in Exhibit 1039?

8     A     If the definition that I'm reading here is

9   that if you had to announce your website address

10  over the radio, would people understand it or would

11  you have to explain it?  In my opinion, that is

12  another way of phrasing what we've been discussing

13  here the entire time.

14    Q     Is it the same as yours or is it

15  different?

16    A     From my perspective it's the same and

17  that's because I make a loose interpretation.  I

18  loosely read all of these.  It's not explicit.

19    Q     Under your definition of the radio test,

20  domain names that require an explanation to be

21  memorable don't pass?

22    A     I don't think I can definitively say based

1   off of one criteria what will or will not pass the

2   radio test.  Individuals and context matter.

3       Q    So under some circumstances domain names

4   that require an explanation will pass the radio test

5   and under other circumstances they won't?

6       A    I don't think I would necessarily

7   interpret it that way.  I see it from a different

8   perspective.

9       Q    Under your definition of the radio test,

10  do you require that domain names -- strike that.

11          Under your radio test, do names that

12  require an explanation not pass?

13      A    I haven't thought about it from that

14  perspective.

15      Q    You don't know one way or another?

16      A    I'm thinking.  I suppose the way I read

17  this is that an explanation can help a domain name

18  pass the radio test.

19      Q    But it's not necessary?

20      A    What's not necessary?  You used the word

21  "it."

22      Q    That a domain name doesn't require an

1    explanation to pass the radio test.

2         A    It can pass the radio test without

3    explanation.

4         Q    But if it requires an explanation, can it

5    still pass the radio test?

6         A    I would argue that during a radio segment,

7    the explanation may already be there aiding the

8    ability for your domain to pass.

9         Q    Well, I'm not looking for an argument.

10   I'm asking whether if a domain name requires an

11   explanation, can it pass the radio test?

12        A    I think it's safe to say even if a domain

13   name requires an explanation it would be fair to

14   pass it through the radio test.

15        Q    In Exhibit 1039 there's discussion under

16   one, use the radio test and there's a discussion

17   under two that says use targeted keywords.  Do you

18   see that?

19        A    1039 again?  Sorry.

20        Q    Yeah.  It's 1039 which is the article

21   called -- it's all in the domain name by MJS Web

22   Solutions.  Are you looking at it?

1          COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2          I, LAQUICIA THOMAS, Court Reporter and Notary

3     Public in and for the Commonwealth of Virginia at

4     Large, and whose commission expires February 28, 2018,

5     do certify that the aforementioned appeared before me,

6     was sworn by me, and was thereupon examined by counsel;

7     and that the foregoing is a true, correct, and full

8     transcript of the testimony adduced.

9          I further certify that I am neither related to

10    or associated with any counsel or party to the

11    proceeding; nor otherwise interested in the event

12    thereof.

13

14

15          _____

16          LaQuicia Thomas

17          Notary Public

18          Commonwealth of Virginia at Large

19          Notary No. 7363169

20

21

22